HOLMES *v.* STATE.

In Banc. Apr. 16, 1951.

No. 37740 (51 So. (2d) 755)

James T. Bridges and C. M. Murphy, Jr., for appellant.

Joe T. Patterson, Assistant Attorney General, for appellee.

Kyle, J.

Appellant, Charlie Holmes, was indicted and tried and convicted at the February 1950 term of the circuit court of Humphreys County on a charge of murder in the killing of L. B. Trawweek, and was sentenced to be executed. The killing occurred on Ruby Street in the Negro section of the town of Belzoni on the night of November 29-30, 1949. Death resulted from a pistol shot which entered the head just above the right eye, ranged downward and lodged in the left side of the backbone. The shooting occurred a short time before 3:00 o'clock a. m. No eye witnesses testified to the killing.

The appellant was arrested in Yazoo City on the following morning and only a few hours after the killing. At the time of his arrest he had in his possession $32.86 in money. A short time before his arrest he had called at the home of one Maggie Reasor and had left with her $160.00 in currency. The police officers, after making the arrest, recovered from one B. J. Harris, a Negro taxicab driver in Yazoo City, a pistol which was later identified as the pistol from which the fatal shot had been fired and which Harris stated the appellant had left in the glove compartment of Harris' taxicab about 9:00 o'clock a. m.

Herbert Harrington, also known as ''Blackie'' Harrington, the chief witness who testified for the state, testified

that Trawweek, Harrington and two other employees of the Telephone Company, whose names were Hunter and Wood, had spent several hours of the night on which the homicide occurred in visiting two or three Negro cafes or night spots in the northern outskirts of the town of Belzoni, and during that time had purchased and consumed several pints of whiskey; that while they were in front of 'Jake's Place" they ran into the appellant, engaged him in conversation and thereafter made use of his services in procuring drinks; that after leaving "Jake's Place" the party went to "Bea's Place", which appears to have been a Negro cafe and entertainment hall nearby; that Harrington gave to the appellant money to pay for drinks and in addition thereto let the appellant have several twenty dollar bills to "flash" in the presence of other guests; that the party left "Bea's Place" sometime after midnight and drove to Ruby Street, which is in the Negro section of the town of Belzoni west of the railroad tracks; that while they were on their way to Ruby Street, Trawweek reached into the glove compartment of Harrington's automobile and took Harrington's pistol from the glove compartment and put it in his pocket; that when they arrived at Ruby Street, the appellant said to Trawweek, "Cap'n or Boss, I want to talk to you"; that the appellant and Trawweek then got out of the car and went behind the car.

Harrington testified further that after Trawweek and the appellant left the automobile in Ruby Street Harrington and his two remaining companions went to sleep in the automobile; that when they awoke the roosters were crowing, although it was still dark; that he then drove the automobile to his boarding house and found that Trawweek was not in. Harrington testified that he did not see Trawweek again after he got out of the automobile on Ruby Street.

Neither Hunter, who drove the party from "Bea's Place" to Ruby Street, nor Wood, the remaining occupant of the automobile, testified during the trial.

Jeanie Lee, who resided on Ruby Street, testified that he heard the pistol shot, went to the door and heard somebody "up there" heaving; that he called Will Mason, who lived next door and that the two went immediately to the scene of the shooting and saw the deceased writhing in pain in the middle of the street. They immediately notified the officers and after the arrival of the officers the wounded man was placed in a truck and carried to a doctor's office, but died a short time thereafter.

Five alleged confessions or exculpatory statements made by the defendant were testified to by the witnesses for the state. Three of these confessions or exculpatory statements were made by the appellant to the officers in Yazoo City and Belzoni. One was made at the Highway Patrol office in the city of Jackson during the evening after the appellant had been arrested in Yazoo City. The remaining confession was made by the appellant to J. C. Kelly, deputy sheriff of Hinds County and chief of the Criminal Division in the sheriff's office of Hinds County, in the presence of J. T. Naugher, Chief Criminal Deputy, and Bob Thomas, Deputy Sheriff of the Criminal Division.

The appellant had been brought to the Hinds County jail on November 30 and was questioned by Kelly on the night of December 3. The questioning lasted about two hours. Before Kelly was permitted to tell the jury what was said, a preliminary examination was had before the trial judge and out of the presence of the jury for the purpose of determining whether the confession was free and voluntary. Kelly testified that the questioning took place in the criminal deputy sheriff's office on the basement floor of the Hinds County courthouse. Kelly testified that he did not talk to or attempt to question the appellant while he was in jail behind the bars. He said he did not know whether anyone else talked to him or not. Kelly was asked the following questions and made the following answers:

"Q. You couldn't say whether Charlie Holmes had been worked over before they brought him down? A. I can say that is not the practice in the Hinds County jail.

"Q. You couldn't say whether that did happen? A. I don't think anybody would have a right to question him except Mr. Naugher or Mr. Thomas or myself.

"Q. Did you ever touch him physically while he was in your custody? A. No Sir.

"Q. How about anybody else? A. No Sir."

Kelly was further questioned as to what kind of treatment the appellant received while he was in the Hinds County jail. The witness answered that the appellant was not in his custody while he was in jail. The witness then testified that there were no threats or promises made to the defendant at any time during his questioning which lasted for about two hours. According to the record he was asked the direct question: "Was he conscious the whole time you were questioning him?" The answer was: "No Sir." This answer may represent an error in the recording of the testimony, but the record shows the question and answer as stated above.

After the preliminary examination of Kelly had been completed, the court overruled the defendant's objection to the admission of the testimony. Neither Naugher nor Thomas was called upon to testify as to what took place at the time the confession was obtained or as to whether the confession was free and voluntary, but the jury was brought in, and Kelly testified to the following facts: That Charlie Holmes stated that he was in a place in Belzoni called "Jake's Place" with Harrington, Trawweek and their two companions on the night of the alleged killing; that he had never seen them before; that they stopped out in front and called him and got him to go in and get some drinks for them; that they gave him some money in twenty dollar bills to buy the drinks with; that he asked them later to let him have some of the money to go in and "flash" and show off, which they did; that they stayed around "Jake's Place" until about 11:00

o'clock, left there and went to a place which he referred to as the "Big Yellow Gal's Place", and went back into a side room where they sat down and had more drinks; that they let him keep the money that he was holding for them to pay for their drinks and things that they bought; that, as best he could recall, there was $160.00 in twenty dollar bills that he was holding; that when they left the "Big Yellow Gal's Place", they all got in an automobile to take him home; that he didn't know the name of the street, but he said the street was back of the depot in Belzoni; that they parked their car there and that he and Mr. Trawweek got out of the car, and the other three boys were asleep in the car; that Mr. Trawweek, before he got out of the car, took the pistol out of the glove compartment of the car and put it in his pocket, and that they went down the street to the girl's house that they call Mary Frances, that he knocked on the door and talked to Mary Frances and after a while Mr. Trawweek went into the house; that Mr. Trawweek had been in the house only a short time when he heard a "rukus" start and the door was flung open and Mary Frances and Trawweek were tussling with each other and she was fighting Mr. Trawweek with her straightening comb, a heavy iron comb with a handle like a fire poker that is used for straightening hair; that as they came out the door Mr. Trawweek reached in his pocket and took a pistol out and had it in his hand; that he, the defendant, figured a way to help Mary Frances, and he got to the door and snatched the pistol from Mr. Trawweek, which was down by his side, and struck Mr. Trawweek twice or three times out in the yard; that he, the defendant, crossed the road ditch in front of the house and got out in the street and Mr. Trawweek followed him out into the street, and he struck Mr. Trawweek in the head with the butt of the pistol; that Mr. Trawweek dropped to his knees and as he attempted to rise he, the defendant, shot him.

That in effect is the confession which the defendant is alleged to have made to the officers in the Hinds County courthouse on December 3.

On cross-examination Kelly testified further that he told the defendant that he had heard that there was an eyewitness to the shooting, and that he had also heard that Mary Frances saw the shooting. Kelly also stated that he had talked to Mary Frances the day after the defendant made the foregoing confession. Mary Frances was not called as a witness to testify in the case.

After the State had concluded its proof the defendant took the witness stand and testified in his own behalf. The defendant testified that he did not get in the automobile with Trawweek and Harrington and the other two members of their party when they left "Bea's Place" sometime after midnight, and that he did not go with them to Ruby Street, but went to his uncle's house in another part of town; that he was not present when the shooting occurred on Ruby Street and had no knowledge of the facts concerning the shooting. He testified that he caught a ride to Yazoo City the next morning and arrived in Yazoo City about 9:00 o'clock. He testified that the money that he had with him was the money which Blackie Harrington had turned over to him the night before. He denied that he had ever seen or had in his possession the pistol that B. J. Harris delivered to the officers in Yazoo City the morning after the homicide had ben committed, and he denied that he had left the pistol in the pocket of Harris' taxicab.

The defendant denied that he had made the confessions alleged to have been made by him and testified to by the state witnesses. He vigorously denied that he had knowingly, freely and voluntarily made the statements alleged to have been made by him to the witness Kelly in the Hinds County courthouse on the night of December 3. He testified that when the questioning was begun the Hinds County officer said to him, "Now, I am ready to start writing, what do you want me to put on this paper?"

and that he, the defendant, replied, "I ain't going to sign it"; that the officer then said, "You say you had that man's money and then you say you didn't kill that man?"; that the defendant then replied, "Yes Sir, them people were too nice to me." The defendant testified that "They punched me and held my head and hit me and I near about lost my breath. What I answered then, I don't know." The record then shows the following questions and answers:

"Q. How long did that go on? A. That went on about an hour.

"Q. Did he hit you in the mouth? A. Yes Sir.

"Q. What did they do? A. They said, 'That ain't the truth, you are going to tell it or we are going to put you on the horse' and I said, 'I ain't never seen it.' They cut an inner tube into pieces about that wide (indicating) and put that around my wrists and put the handcuffs on and run the rod through here (indicating) and handcuffed my feet and when I got up off the floor, what I answered then I don't know. When I come to, they said, 'We got your confession.' Then they put me in the hole, a padded cell. I stayed there three or four days . . .

"Q. Was that the only time they worked you over? A. That was the only rough stuff until a day or two later then they had that pipe. They said, 'Do you know what your statement is, whatever we put in it is true, we are going to put you back on the horse.' 'Boss', I said, 'Whatever you said is true, I don't want to go back on that horse.' "

The state introduced no witnesses in rebuttal to contradict any of the foregoing statements made by the defendant relating to the alleged threats and brutal treatment meted out to him while he was in the custody of the Hinds County officers.

The defendant's attorneys, at the conclusion of the testimony, moved that the court exclude the confessions offered by the state and direct the jury to disregard the

confessions on the ground that they were not free and voluntary. The court overruled the motion.

We think that the court committed reversible. error in the first instance by permitting the alleged confession testified to by Kelly, the Hinds County deputy sheriff, to go to the jury without hearing the testimony of Naugher and Thomas, both deputy sheriffs of Hinds County, who were present during the two-hour interview which Kelly had with the defendant. Neither of these two officers was called upon to testify, and no reason is shown for their failure to testify. Both of them should have been called as witnesses during the preliminary hearing to testify as to whether the confession was free and voluntary, and the defendant's attorneys should have been given an opportunity to cross-examine them, in order that the facts might be fully developed, and in order that the court might be able to determine whether the confession had been made freely and voluntarily.

The defendant should then have been given an opportunity to offer rebuttal testimony, during the preliminary hearing and out of the presence of the jury, to show that the alleged confession was not made by him freely and voluntarily.

In the case of Ellis v. State, 65 Miss. 44, 3 So. 188, the court held that if the trial judge is satisfied after hearing all the testimony pertinent to the inquiry that the confession is admissible, it should go to the jury, but unless it plainly appears that it was free and voluntary— if there is a reasonable doubt against its being free and voluntary—it should be excluded from the jury.

After the defendant had testified that the confession alleged to have been made by him to the Hinds County officers was made as a result of threats and intimidation, as testified to in detail by the defendant, the State should have offered additional testimony, if such testimony were available, to contradict the testimony of the defendant as to what took place at the time the confession was obtained and immediately prior thereto. Yet no such

testimony was offered. Kelly was not placed back on the witness stand to deny the charges made by the defendant, and neither of the other two deputies were called upon to testify, although Kelly had stated that they were present at the time the alleged confession was obtained.

It is true that the defendant's testimony concerning the brutal treatment which he had received at the hands of the Hinds County officers to force him to confess to the crime was lacking in clarity and at times was garbled and incoherent; and the testimony may have been entirely false; but it was not such testimony as the prosecution should have expected the court and the jury to ignore, when the prosecution had it within its power to offer rebuttal testimony to refute the charges made against the Hinds County officers and yet offered no such testimony. We think that under the circumstances it was the duty of the prosecution to call as witnesses the two deputy sheriffs who were present at the time the alleged confession was made and the jailer in whose custody the defendant was kept to disprove the charges made by the defendant if those charges were false.

 There may have been no threats or force used by Kelly or by anyone else in his presence, as Kelly stated, to force the defendant to make a confession; but if prior to the time Kelly had his interview with the defendant threats or force had been used by the jailer upstairs or by other deputies who had access to the prisoner, the influence of such prior threats or force would have been as effective to bring about the confession as if such threats or force had been used after the defendant had been brought downstairs. And if the confession was obtained while the defendant was under the influence of such prior threats or force, the confession was involuntary and not admissible as evidence against the defendant. White v. State, 129 Miss. 182, 91 So. 903, 24 A. L. R. 699; Banks v. State, 93 Miss. 700, 47 So. 437.

The question presented to us on this appeal is unlike

the question presented to the Court in the case of Loftin v. State, 150 Miss. 228, 116 So. 435, for the reason that in the Loftin case no motion was made to exclude the confession after the defendant had testified to facts tending to show that the confession was made under the influence of fear and as a result of threats and intimidation, while in this case such motion was made by the defendant and was overruled by the Court.

In view of the action of the lower court in admitting the testimony as to the alleged confession made by the defendant to the Hinds County officers without hearing the testimony of Naugher and Thomas as to whether the confession was made freely and voluntarily, and in view of the failure of the State to offer any rebuttal testimony to contradict the testimony of the defendant as to the brutal mistreatment which he claimed to have received at the hands of the Hinds County officers, the judgment of the lower court must be reversed and the cause remanded for a new trial.

Reversed and remanded.