AUTRY *v.* STATE

No. 40410 March 4, 1957 92 So. 2d 856

*Robert B. Smith,* Ripley, for appellant.

*John H. Price, Jr., Asst. Atty. Gen.,* Jackson, for appellee.

ROBERDS, P. J.

Douglas Autry, the appellant, was County Superintendent of Education of Benton County, Mississippi, for a term beginning January 1, 1952, and ending December 31, 1955. He was convicted in this proceeding of embezzling school money of that county.

He says the testimony was insufficient to sustain the conviction. He requested, but was refused, a peremptory instruction. On this appeal he urges us to discharge him.

He was jointly indicted with H. M. Rowland and F. P. Wren. A severance was granted Autry. The proof on behalf of the State strongly tended to establish that, on December 20, 1954, F. P. Wren was operating at Holly Springs, Mississippi, a retail gasoline station known as Gulf Oil Company, at which he also sold automobile supplies and repair parts; that on that day Row-

land and Autry came to his station and requested him to lend them $400; that he was reluctant to do that because he needed to use the money he had on hand to purchase gasoline. However, Rowland and Autry were his friends, so he absented himself and arranged with his local gasoline distributor, from whom he purchased his gasoline, to grant him credit for the next tank of gasoline which he might purchase; he returned to the station and told Rowland and Autry he had arranged to lend them the money; that Rowland and Autry said they would repay him $600 for the $400 they were then borrowing from him; that he gave the money to Autry, who signed a check, which Rowland endorsed, but which was to be held until Rowland and Autry returned with the money; and that about January 20, 1955, Autry and Rowland returned to his station. They had in their possession a school warrant numbered 572 which had been issued and signed by Autry as County Superintendent of Education of Benton County for the sum of $630.00, the payee being Gulf Oil Company (Holly Springs), and was payable out of the school funds of the county. It was dated January 20, 1954. It is agreed that the year should have been 1955. The error as to the year is unimportant in this case. The warrant recited that it was in payment of three thousand gallons of gasoline used in the operation of the public schools of the county. Wren did not want to accept the warrant. He wanted cash money. Autry said this was the best he could do, so Wren accepted the warrant. He gave Autry $24 in cash; retained five dollars and some cents for gasoline he had just placed in the tank of the automobile for Autry and Rowland, and, according to Wren, ''I started to give them the change and they said keep the change.'' Wren did keep $600. Wren endorsed the warrant and cashed it through the Bank of Ashland, the county depository. He redelivered to Autry the check Autry had given him on the first visit.

The county did not owe Wren, or his gasoline station, or the Gulf Distributor at Holly Springs, for gasoline or anything else. Of course, no bill or invoice was sent to the county by either of the foregoing. The county never received any gasoline. The county lost the $630, and Autry and Rowland appropriated to themselves four hundred and twenty-nine dollars and some odd cents, money of the Benton County school funds, as a result of these manipulations.

Naturally, most of the testimony for the State relating to the foregoing transactions was given by Wren. However, the warrant itself and the records of the bank and of the county established, or greatly aided in establishing, many of the material facts about which Wren orally testified, and these records, in addition, proved, without contradiction, other pertinent facts bearing upon the guilt or innocence of Autry,—for instance, that Autry caused the county board of education to innocently authorize the issuance of the warrant in payment of three thousand gallons of gasoline supposedly sold and delivered to the county.

Autry, testifying in his own behalf, denied that he appropriated to his own use the $630, and also denied the making of the arrangement Wren said was made and carried out, yet he admitted that he presented the claim to the county board of education; also admitted that he issued and signed the warrant; and admitted that Benton County did not owe the payee in the warrant, and that the payee did not have any claim against the county, and that when he presented the claim to the county board for approval he falsely represented to the board that the money was owing the Gulf Oil Company. He said the warrant should have been payable to Rowland Brothers, of which partnership H. M. Rowland was a member, but he chose to make it payable to Gulf Oil Company for the reason that he had been criticized for the extensive purchases of school supplies he had made as

county superintendent of education from Rowland Brothers.

Autry introduced two witnesses besides himself but their testimony related to an audit of the county school affairs and its transmittal to the chancery clerk and to Autry, and his knowledge, or lack of knowledge, thereof. The testimony of these two witnesses had little bearing upon the pertinent facts involved in the guilt or innocence of Autry.

The indictment charged that Autry, aided and abetted by Rowland and Wren, did knowingly, fraudulently and feloniously embezzle and convert to his own use $630, the property of Benton County, while he, Autry, was acting in his official capacity of county superintendent of education of said county, by fraudulently and feloniously issuing a false school warrant, (setting out a copy of the warrant) knowing at the time no money was owing to Wren or the Gulf Oil Company (Holly Springs), and that by such issuance of said school warrant he did defraud and cheat Benton County and embezzle the school money of said county.

The main reason the verdict is not supported by the evidence, according to Autry's contention, is that the principal witness against him was Wren, an accomplice. It is true that the testimony of an accomplice should be weighed with care and caution, yet it is also true that such testimony alone may be sufficient to sustain a verdict of guilty. Vol. 5, Miss. Digest, Criminal Law, Section 508 (9), 509 and 510. In this case, as above shown, the admissions of Autry and the records of the bank and of the county constitute strong corroborating evidence of that given by Wren.

It is very clear, it seems to us, that the jury was amply justified under the evidence in this case in finding that Autry was guilty of the charge made against him.

 Autry applied for a continuance of the case to the next term of court. The application was denied. He says that was reversible error. His main reasons in support of his application were (1) that number of other indictments had been returned against him, growing out of his handling of school funds while superintendent of education, necessitating extensive research and investigation by himself and his counsel; and (2) that the State Department of Audit, as a part of its investigation of school finances of the county, had obtained written statements from various parties pertaining to their actual, or supposed, dealings with the school funds of the county, and that he, Autry, had not been furnished copies of such statements, We do not think the trial judge committed error in denying the application for continuance. The State Department of Audit made an audit of Autry's office as county superintendent of education for the period from July 1, 1954, to June 30, 1955. That audit was duly filed with the Chancery Clerk of Benton County as the law directs. It was a public document. A copy of it was delivered by the clerk to counsel for Autry. In addition, on June 6, 1956, the State Department of Audit transmitted to Autry a demand for repayment to the county many items the Department claimed to be owing the county by Autry and his surety, including the $630 involved in this proceeding. That demand aggregated some seventy-eight thousand dollars and it set out in detail the nature of every claim being made upon Autry and his surety, and the names of the parties involved, as shown by the records of Autry's office. The parties who made statements to the Department of Audit were just as accessible to Autry as to that Department. The essentials of the charge here involved were rather simple. The main essentials were that Autry issued a false warrant purportedly in payment of gasoline sold the county; that no such debt was owing, that the warrant was cashed, and that Autry converted to

himself a specified amount of money from the proceeds of the warrant. A copy of the warrant was set out in the indictment. These charges did not involve complicated issues. ██ █ It is familiar learning that a trial judge has large discretion in matters of continuance. We cannot say the trial judge abused his discretion under the circumstances confronting him. And looking at the situation as a completed trial, which we have a right to do, we cannot say Autry was in any manner prejudiced by the foregoing action. It appears from the record that every right and defense Autry had was diligently presented, protected and preserved by his able counsel.

██ █ Autry was sentenced to serve seven years in the state penitentiary. He says that under the charge against him the sentence could not have been more than five years. The indictment did not specify the code section under which it was drawn, as it should have done. ██ █ We have heretofore set out the essential charges of the indictment. Autry says Section 2122, Miss. Code 1942, governs. That section limits the punishment to not more than five years in the penitentiary. It requires that county officers (and other officials) keep an accurate record of all public money, securities, etc., which may come into their hands as public officials, and if they willfully and fraudulently make any false entries "or indorsement of any warrant on the treasury that the same is genuine, when the same is in fact not a genuine warrant * * *", or if such officer shall, by any willful act or omission of duty, defraud, or attempt to defraud the named governmental agencies, he is guilty of embezzlement. We do not think this section applicable here, or, at least, not exclusive under the facts of this case. This was a joint indictment against three persons, only one of whom was an official. It was necessary to show their actions in concert to prove the crime. These actions were certainly most unusual. They were more than the mere issuance of a false warrant. The grava-

man of the crime here is not so much the issuance of a false warrant as the appropriation by Autry to himself of the money made available by the issuance of such warrant. It was necessary to show that Autry converted the money to his own use and how he did it. It will be noted, too, that this section refers to the endorsement of a false warrant on the treasury. The warrant in the case at bar was not drawn on the treasury. The warrant was addressed to the county depository and was payable "out of Trans. Min. Program MINIUM PROGRAM FUND * * *" for services rendered in furnishing three thousand gallons of gasoline to the public schools of Benton County. In a criminal prosecution the question of variance between the express wording of the warrant and those prescribed by the statute might be pressed with much plausibility, especially where, as is now the case in this State, there is no county treasury, and also where there may be more than one depository for the county funds.

Section 2123, said Code, is as follows: "Embezzlement—by officers and official employees generally.— If any officer, or other person employed in any public office, shall commit any fraud or embezzlement therein, he shall be imprisoned in the penitentiary not more than ten years, or in the county jail not more than one year, or be fined."

We think this section applicable to the offense charged in the indictment. The section does not undertake to specify in detail the factual situation necessary to constitute the crime of embezzlement. However, the indictment in this case does detail and set out the essential facts to show an embezzlement of the funds of the county. The general provisions of this statute, supplemented by the averments in the indictment sufficient to support the crime of embezzlement, would seem to meet the unusual circumstances involved in this case.

Blakeney v. State, 228 Miss. 162, 87 So. 2d 472, has much bearing upon this question. In that case Blakeney, a supervisor, caused a warrant to be issued to a workman for seven and a half days work supposedly done for the county, whereas the fact was the work had been done upon the personal farm of Blakeney. The indictment was under Section 2123. The indictment described the acts of the accused constituting the fraud on the county, and this Court held that the specified acts, taken in connection with the provisions of the statute, were sufficient to adequately inform the accused of the nature and cause of the accusation against him. In that case Blakeney got the benefit of seven and a half days labor, for which the county paid, and in the case at bar Autry converted to himself a considerable sum of money belonging to the county, the result in each case coming about through the machinations of defendants as described in the indictments. In both cases false warrants were issued. This Court recognized the Blakeney proceeding was properly under Section 2123. That case and the case at bar are substantially the same in their fundamental elements.

If it be contended that either Section 2120 or 2121, said Code, applies to the facts of this case, the answer would be that both sections permit a maximum penalty of more than the sentence imposed by the trial judge in the case at bar.

▇▇ Autry contends on this appeal that the court forced him to testify as a witness and that this was reversible error. That situation arose in this manner: The State had put on its proof in chief and rested. Defendant then put on his evidence. He voluntarily took the stand himself. He was examined in chief by his own counsel and then cross-examined by counsel for the State and then redirectly examined by his own counsel, who then said "That is all. The defendant closes"; whereupon counsel for the State announced that he would like

to further cross-examine the witness. Counsel for Autry objected to this because "the defendant has closed his case * * *" and it would be unfair to permit counsel for the State to confer and then recross-examine Autry. The trial judge sustained the objection. Counsel for the State then said: "We haven't rested. It is our rebuttal." The court then said: "If it is in rebuttal, I will permit you to recall him as your witness." Counsel for Autry then objected to Autry being examined in rebuttal, saying defendant had closed his case and had been fully cross-examined, and objected to the State cross-examining Autry either as his own witness or as the witness of the State. The prosecuting attorney then said: "I want to lay a predicate." The court then said "All right." Counsel for the State then proceeded to examine Autry. Autry's attention was called to testimony he had already given to the effect that he docketed in the name of Gulf Oil Company the claim here involved because there had been considerable public criticism of Autry for buying from Rowland Brothers large quantities of gasoline, oil, etc. Autry, in effect, admitted that he had already testified to that. He was asked when the complaints had been made. He replied: "At various times. I couldn't tell you exactly." He was asked when with reference to December 1954 and January 1955, and replied "I couldn't tell you." He was asked: "You don't know whether it was a month before or three or four months?" He replied: "No, sir, it wasn't just one complaint. He said he had heard them, too. We were just discussing it." He was then asked when he decided not to make out any more claims against the school fund in favor of Rowland Brothers, and replied: "That night when we decided to do that one the way it was done." He was asked if he was worried about the matter December 15th, when the school board met, and replied: "I was worried about it all along with the election coming up." He said that he didn't know whether

he paid Rowland a warrant in December. This question was asked: "When did you decide that you wouldn't be worried any more about paying him claims in his own name?" and replied: "I have no way of knowing." He was asked if he didn't pay Rowland Brothers $269.45 in December, and replied "I don't know." He was further asked if he didn't have a warrant issued to Rowland Brothers at the February meeting of the board for $394, and replied "I can't answer that." At this point counsel for the State requested that the school board claim docket be brought in, whereupon counsel for defendant objected "to this testimony." The court said: "I can't see that there is anything in rebuttal." Counsel for the State said Autry had previously testified that he paid the claims in names of others because of complaints about allowing so many claims to Rowland Brothers. The court said: "I am sustaining the objection. I don't think it is rebuttal testimony at all." The State's counsel asked that the jury retire "and let us present this." The court said: "It is not rebuttal testimony so far as he is concerned. You should have brought it out in chief." Counsel for the State said "We have a right to lay a predicate * * *". The court replied: "He is testifying the same thing he did about the rumors." The State's counsel asked permission to ask one more question. Permission was granted. Counsel for the State then asked: "It is just repetition, but as I understand it, you don't know whether you paid any claim in December 1954 or February 1955 to Harold Rowland in the trade name of Rowland Brothers?" He replied "No, sir."

We have set forth the proceedings at length because we realize that we are considering a serious question.

We do not know from the record whether Autry was still in the witness chair or had taken a seat beside his counsel when the State first requested permission to further examine him. However, we do not think that

matters. The State had not closed its case. The State
had the right to examine him, as a matter of procedure,
by cross-examination or to lay a predicate, subject to
limitations, in the sound discretion of the trial judge.
It is not claimed here by Autry that, as a matter of pro-
cedure, the action was not justified. The argument is
that Autry's constitutional rights were violated. Article
V of the Constitution of the United States provides that
no person "* * * shall be compelled in any criminal case
to be a witness against himself." Article 3, Section 26,
Mississippi Constitution of 1890, contains a provision
that in criminal prosecutions an accused "shall not be
compelled to give evidence against himself."
However, it seems to be recognized by all of the courts
that this immunity can be waived by the accused, and
that he does so when he takes the stand and testifies on
the merits of the case. The rule is stated in this lan-
guage in 58 Am. Jur., "Witnesses", p. 80, Section 96:

"An accused may waive his constitutional immunity
from giving testimony against himself by offering him-
self as a witness. By electing to testify, the accused
subjects himself to cross-examination and impeachment,
and makes permissible comment by the prosecuting at-
torney upon his testimony. When he voluntarily takes
the witness stand in his own behalf, he waives his con-
stitutional privilege of not answering proper questions
that may tend to convict him of the crime for which he is
on trial, and, as has frequently been stated, he subjects
himself to the same rules that govern other witnesses,
and further, he subjects himself to cross-examination and
impeachment to the same extent as any other witness in
the same situation.

"The constitutional rule against self-incrimination
does not limit the cross-examination of an accused testi-
fying in his own behalf, except that he may not be re-
quired to state facts constituting an independent crime,
unless the answer to the question also tends to convict

him of the offense charged or bears on any issue involved in the case. His voluntary offer of testimony
upon any fact is a waiver as to all other relevant facts
because of the necessary connection between them all.
Under this rule the accused by taking the witness stand
in his own behalf waives the constitutional guaranty
against compulsory self-crimination not only as to matters about which he has given testimony in chief, but also
concerning any matter pertinent to the issue on trial regardless of the extent of the direct examination, and cannot then refuse to testify to any fact which would be
compentent evidence in the case if proved by any other
witness. * * *

"The waiver by the accused is not partial. Having
once cast aside the cloak of immunity, he may not resume it at will whenever croos-examination may be
inconvenient or embrarrassing."

Perkins v. State, 229 Miss. 299, 90 So. 2d 650, bears
upon this question. Perkins was indicted for murder and
convicted for manslaughter. We quote the pertinent part
of the opinion: "It is also complained by the appellant
that the Court erred in permitting the State to reopen its
case after both the State and the defense had rested.
The State asked and was granted leave to reopen its case
for the purpose of recalling the appellant for cross-
examination as to prior convictions of crimes, and for
the purpose of impeachment testimony in the event the
appellant should deny such prior convictions. The appellant admitted such prior convictions and this, of
course, dispensed with the necessity of introducing impeaching testimony. The action of the court in permitting the State to reopen its case manifestly resulted
in no prejudice to the appellant. The matter of reopening the case was a matter addressed to the sound
discretion of the court and it is clear from the record
that such discretion was not abused. Baird v. State,

146 Miss. 547, 112 So. 705; Morris v. State, 148 Miss. 680, 114 So. 750."

Designating Autry a State's witness did not make him so. He was his own witness, and, as such, subject to examination as any other witness.

 ██ Attorneys for the prosecution never assented to recalling Autry as the State's witness. Throughout they said they desired to further cross-examine him or lay a predicate. Nor did counsel for the State waive their right to cross-examine Autry, or lay a predicate to impeach him, by first consulting with each other. They had a right to confer together to determine whether they desired to further examine him.

It is noted, too, that the questions asked Autry and the answers given by him were, to a large extent, repetition of questions and answers which had been asked and given on his cross-examination. We do not think Autry's constitutional rights were violated.

Autry complains of certain instructions granted the State. Considering together all of the instructions given in the case, we do not find error in the granting of the instructions of which complaint is made.

We think Autry had a fair trial and that the case should be affirmed.

Affirmed.

All Justices concur.