CHATMAN *v.* STATE

No. 42301          October 15, 1962          145 So. 2d 707

*Robert Y. Wood, Jr., Joseph S. Zuccaro,* Natchez, for appellant.

*G. Garland Lyell, Jr.*, Asst. Atty. Gen., Jackson, for appellee.

LEE, P. J.

Ike Chatman was found guilty by a jury in the Circuit Court of Adams County of the forcible rape of Mahalia Brown. They certified their inability to agree upon his punishment, but also recommended mercy. From the judgment, sentencing him to life imprisonment in the state penitentiary, Chatman appealed.

Mahalia was thirty-two years of age. She had two sons, Frank and Foster Garner by her first "common-law husband", as she designated him, and another son, J. W. Brown, by her second "common-law" husband.

She explained that the latter's name was like that because she was not married at the time. She said that she lived with the other men as common-law wife. She was then lawfully married about four years ago, but she and her husband separated shortly thereafter and were still separated at the time of this alleged crime.

According to her version, although she had seen Ike Chatman several times in Natchez, he had never asked her for a date. About nine o'clock Saturday night, May 13, 1961, she was on her way out St. Catherine Street going to her home on Homochitto Street. She said that she saw Chatman, who said, "Hi, you going home", and she replied that she was. Then he told her that he would take her home and that he was going to Rinky Dink Inn. He also asked her if she and her husbank were together and she told him, "No". She got into the car. He then said he had to go over the by-pass and would then put her out at home. Actually he went across the Mississippi River to Vidalia, Louisiana to collect for some whiskey, as he said. He then drove to a filling station and got some gasoline. After leaving this place, instead of taking her home, he said that he had to get rid of a gallon of bootleg liquor, and would get her something to eat, since she had said that she was hungry. They went to Reed's place where she ate a fish sandwich and drank part of a quart of beer. They were sitting at the table together. She was not forced to go in there, and, at that time, there was no reason to be made. They stayed there "not quite an hour".

Leaving the eating place, under Chatman's promise to take her home, they crossed a bridge. Then it was that he came out with a knife in one hand and a pistol in the other, and, with threats of violence to her if she resisted, he made her disrobe and lie on the front seat, where he criminally assaulted her. He then made her get into the rear seat and assaulted her again. He let her

put her clothes on, and, after driving a short distance, he tried to force her to practice sodomy on him. Following this, he took her home. At that time it was four o'clock on Sunday morning. She said that, as he left, he threatened to kill her if she told anybody about what had occurred. She said that, immediately after she got home, she took "a corsage *** with some lysol", evidently meaning a douche.

She admitted that, although her neighborhood was thickly settled, she did not make any complaint to any of her neighbors. She had a telephone in her home, but she called no one until seven or eight o'clock, "I don't really know the time, but it was in the morning", when she called the police, and they told her not to come to the station. No witness from the police department corroborated her complaint.

She went to the Charity Hospital in Natchez Sunday night. The superintendent of the hospital testified that, according to the records, Mahalia Brown was treated at 9:45 p. m. Sunday, May 14, 1961, by Dr. Lima, who was shown to be either in Brazil or Argentina.

The defendant did not testify. Several witnesses, offered by the defendant, testified that the reputation of the prosecutrix for chasity and morality in the community in which she lived was bad.

Defendant's counsel then sought to offer in evidence a witness by the name of Walter Johnson to show that he had a conversation with the prosecutrix on Monday afternoon after the alleged rape. The State objected that no predicate for impeachment had been laid. This was sustained. Council then said, "We call Mahalia Brown as an adverse witness". The district attorney said, "That's highly improper and we object to that at this time. The State has rested its case." The court replied, "I don't think you can call her as an adverse witness anyway, Mr. Zuccaro. The objection will be sustained". Counsel then asked that the jury be excused,

and the witness was questioned. He testified that Mahalia said that Chatman carried her out, forced her, and carried her three rounds, and that she laughed. He, and the other two men with him, Wilbert Edward and Willie Johnson, all thought that she was joking and playing. Besides, she said that she was out with him the night before. There was an agreement that the other two named persons would also testify to the same facts, and that the State would object, and that the court would sustain the objection.

The defendant assigns and argues numerous errors. The Court notices only three, namely, (1) the alleged error in permitting the officer to testify that Dr. Lima was not in the country; (2) the alleged error in the court's refusal to let him introduce the evidence of the three witnesses as to their conversation with the prosecutrix on Monday afternoon; and (3) the alleged reversible error of the district attorney in his final argument to the jury "and commenting on the evidence connected with the details of the alleged rape, before and after, made the statement that 'it is the undisputed evidence in this case'," at which time, the defendant's counsel objected, their objection was overruled, and they then made a motion for a mistrial, and the motion was overruled.

On the first question, the State contends that it had the right to show the unavailability of the doctor, because the failure to do so, would indicate, as the most natural inference, that the State feared to do so because it would be unfavorable. It is a well known principle that such an inference is open to explanation by circumstances, which make some other hypothesis a more natural one than the party's fear of exposure. The State is, therefore, entitled to explain the absence of the witness. This principle applies equally in criminal as in civil cases both for the prosecution and the accused. Wigmore on Evidence, 3d Ed., Secs. 285 and 290. Cf. Holmes v.

State, 211 Miss. 436, 51 So. 2d 755, where, on the competency of the confession, only one of the State's witnesses testified, and the opinion, referring to the two other witnesses, said: "Neither of these two officers was called upon to testify, and no reason is shown for their failure to testify". This expression clearly indicates that the above principle was well known to the court. Obviously there was no error in this regard.

██ ██ On the second proposition, of course, strictly speaking, counsel for the defendant should have asked the prosecutrix, while she was on the stand, if she had the conversation, detailed by the offer of the three witnesses, at the time and place stated, and whether she was laughing about the matter. ██ ██ She would have had the opportunity to deny. If she did deny it, then of course, these witnesses could have been used by way of impeachment. However, counsel did not do this. But then they did ask to call her "as an adverse witness". The evidence purpose was to lay the proper predicate. The proper request should have been for additional cross-examination.

██ ██ It would be difficult to imagine any distinction whatever, in the lawyer's field of inquiry, whether the witness is designated "adverse" or "for cross-examination". Subject to reasonable control by the trial court in order that abuse may not be permitted, the defendant, during the presentation of his defense, should be accorded the right and privilege of calling for further cross-examination, any State witness, who has previously testified. Oftentimes, the experienced lawyer, after questioning a witness, advises the court that he reserves the right to recall for further cross-examination. This Court has held that even a defendant, after he has testified and closed his case, could still be recalled in order to lay a predicate. Autry v. State, 230 Miss. 421, 92 So. 2d 856. The opinion cited 58 Am. Jur., Witnesses, Sec. 96, pp. 80-81, in part as follows: "An accused may

waive his constitutional immunity from giving testimony against himself by offering himself as a witness. By electing to testify, the accused subjects himself to cross-examination and impeachment, and makes permissible comment by the prosecuting attorney upon his testimony. When he voluntarily takes the witness stand in his own behalf, he waives his constitutional privilege of not answering proper questions that may tend to convict him of the crime for which he is on trial, and, as has frequently been stated, *he subjects himself to the same rules that govern other witnesses,* and further, *he subjects himself to cross-examination and impeachment to the same extent as any other witness in the same situation.*

"* * * Under this rule the accused by taking the witness stand in his own behalf waives the constitutional guaranty against compulsory self-crimination not only as to matters about which he has given testimony in chief, *but also concerning any matter pertinent to the issue on trial regardless of the extent of the direct examination,* and cannot then refuse to testify to any fact which would be competent evidence in the case if proved by any other witness." (Emphasis supplied.)

The proposed evidence, if believed, was very important to the defense. It was to the effect that the prosecutrix was laughing about the matter. Even if the action of the court could be construed to involve a question of discretion, as a matter of fact, the exercise of discretion, under the particular circumstances, required that counsel be permitted to recall the witness and lay a predicate so that the evidence of the three witnesses tendered might be admissible.

██ █ On the third proposition, in Lambert v. State, 199 Miss. 790, 25 So. 2d 477, involving alleged error on the part of the district attorney in his closing argument, amounting to a comment on the failure of the defendant to testify, the opinion collated a large number of previous decisions of the Court on this particular point, in

which there were both affirmances and reversals. But the opinion pointed out that, in every case except the Johnson case therein mentioned, the Court had reversed for comments of the character there under consideration, unless ''(1) there was an eye-witness other than defendant available to the accused and who was not placed upon the stand by him, or (2) the guilt of defendant was so manifest that no fair jury could have returned a verdict other than guilty.'' See also Martin v. State, 200 Miss. 142, 26 So. 2d 169.

When the alleged rape occurred, there was no claim that anyone other than the prosecutrix and the defendant were present. Besides, the lack of outcry and other circumstances preclude this Court from saying that the guilt of the defendant was so manifest that no fair jury could have returned a verdict other than guilty.

For the errors assigned under propositions (2) and (3), the cause is reversed and remanded for a new trial.

Reversed and remanded.

*Kyle, Ethridge, Rodgers and Jones, JJ.*, concur.