This matter is before the Court on a finding of direct contempt, under Mississippi Code Annotated § 9-1-17 (1972), and summary punishment therefor. The appellant appeared as a defense witness in criminal cause No. 4151 in the Circuit Court of DeSoto County on June 27, 1984, to give testimony on behalf of the defendant, John Tailor Gullett, III, who was being tried for perjury. The appellant testified on June 27th, and a formal contempt citation was entered by the court on the following day. He was found to be in contempt on twenty-seven occasions during the course of his testimony for refusing to answer questions after being so ordered by the court. However, he was sentenced on only six, which six the record does not reveal, to thirty days on each for a total sentence of 180 days.
The background for this cause would interest authors of murder mystery novels. One James Williamson was killed and/or murdered apparently in Panola County. The record in this cause does not reveal the locus delicti. Participants charged in the capital murder of Williamson were the appellant, Larry Shelton Hentz, Williamson's wife "Cookie", and Owen Lee Harden referred to by the appellant as "Lee". Also participating or at least having guilty knowledge of the activities of the participants was the appellant's brother, Roger. *Page 670 
The record here reveals that Harden, the appellant and Roger were incarcerated in several jails over North Mississippi extending from Hernando to Tupelo and Aberdeen, with involuntary visits to the Oxford jail in between. Where they were incarcerated together we are unable to determine from the record. Roger apparently made a deal with the prosecutors and agreed to be a state's witness in the prosecution of the other three. It is the state's theory, supported by evidence in the record, that Cookie planned the death of her husband, that she and the appellant were at least friendly enough to enjoy each other's company in motel rooms, and that she solicited his assistance in the murder of her husband. The appellant contacted Lee to perform the dastardly act. Also to render assistance in driving an automobile, just how this was to assist we do not know, was Roger.
Lee came on for trial in DeSoto County — several counties in the Circuit District were the site of the various trials. Roger was called by the state apparently to testify concerning the conduct of his confederates in the Williamson murder. Gullett had occupied jail cells with the Hentz brothers, being incarcerated for some purpose other than the Williamson murder, and was offered as a defense witness. Gullett's indictment for perjury is not made a part of the record, but it is apparent that he was indicted because of testimony he gave on behalf of Harden wherein he stated that Roger, when a cellmate, said that he was wholly responsible for the murder of Williamson. The district attorney and the grand jury of DeSoto County apparently were not impressed.
In the meantime, the appellant's trial for capital murder came on to be heard in Tate County. During the course of this trial in November, 1983, he pled guilty after a reduction of the charge from capital murder to murder, and was sentenced to life imprisonment as a non-habitual offender. On May 14, 1984, he filed a "Petition for Writ of Habeas Corpus or, in the Alternative, Motion to Withdraw Guilty Plea", in the Tate County action. A copy of this document was made a part of this record by the defense.
As stated, he was called as a witness for Gullett on June 27, 1984. Prior to taking the stand, the court thoroughly instructed appellant as to all of the hazards that appearing as a witness presented, including contempt citation on a question-by-question basis, and appointed the public defender to be with him during the course of his testimony. The court also took a lengthy recess in order to allow a conference between appellant and his counsel. Counsel advised the appellant against testifying but nevertheless he took the stand on Gullett's behalf, and freely and voluntarily told that his brother, Roger, had lied on numerous occasions and, while he did not hear his brother tell Gullett that he, Roger, was responsible for Williamson's death, Roger himself told him that he had informed Gullett that he was the one responsible. Suffice it to say that his testimony on direct related to who killed Williamson.
The state believing, as did the trial judge and as does this Court, that the gate had been thrown wide open, asked on cross-examination question after question concerning the appellant's activities in the murder of Williamson, including statements given to investigating officers. Appellant acknowledged understanding the questions but on each he "pled the Fifth", even though advised by the Court that he must answer the question or be in contempt.
The appellant refused to answer the following series of questions:
 Isn't it true that you told the officers that you asked Lee Harden to do the job for you?
 Isn't it true that you told Cookie that you could get someone from out-of-state to kill James Williamson?
 Isn't it true that you told the officers that sometime during January or February that you and Cookie had a little disagreement and you didn't discuss the murder for about a month?
 Isn't it true that you told the officers that during the month of February that you and Cookie and Lee Harden went to *Page 671 
Arkansas for Lee Harden to meet Cookie's cousin?
 Isn't it true that on Sunday, the 22nd day of March, that you told the officers that you and Cookie met in the motel room in Grenada?
 Isn't it true that you told the officers that Cookie said that everything is ready, the insurance was taken care of, everything was ready to go, and Cookie asked you to get in contact with the man that was to commit the murder?
 Isn't it true that you told the officers that at approximately 4:00 or 4:30 that morning Cookie was to go outside and feed the dogs so the killer could sneak into the house?
 And that the murderer was suppose to come in through the back door and go to the bathroom and he was suppose to hide and wait in the bathroom until Cookie left the house. Is that what you told the officers?
 Now, did you tell the officers that Lee Harden had a 12 guage [sic] shotgun and a gallon of gas and he was to pour the gasoline, shoot him, pour the gasoline in the room where he was and then go through the house lighting the curtains and then go on out the backdoor. Did you tell the officers that?
 Did you tell the officers that Cookie and Lee didn't get along?
 Did you tell the officers that Cookie treated Lee like a dog?
 Did you tell the officers that Lee was to get $10,000.00 out of it?
 Did you tell the officers that Lee Harden didn't collect his $10,000.00, that you would give Lee Harden $400.00 or $500.00 at a time or $200.00 or $300.00 at a time, that you couldn't recall how much money you had given Lee Harden?
 Did you tell the officers that it would be hard for you to estimate how much money you gave Lee Harden but that it wasn't near $10,000.00?
 Did you tell the officers that Roger Lynn was suppose to drive the car?
 Did you tell the officers that Roger Lynn wasn't suppose to get anything out of it?
 Did you tell the officers that you and Cookie had discussed killing Mrs. Mable Williamson, the 90 year old mother of James Williamson?
 Did you tell the officers the reason you and Cookie discussed killing Mrs. Mable Williamson was because the land surrounding the home upon which Cookie and James lived, Mrs. Mable had a life estate in it, Cookie couldn't get any income from it?
 Mr. Hentz, it is true that you and Cookie Williamson planned the murder of James Williamson, isn't it?
 It is true that you recruited Owen Lee Harden to be the man to pull the trigger and burn down the house of James Williamson, isn't it?
 Is it true that you recruited your younger brother, Roger Lynn Hentz, to drive one of the vehicles.
Several times during the course of his testimony the trial court did advise the appellant that he was in contempt of court. When he left the stand, which was apparently late in the day inasmuch as the record does show that there was a lunch recess at a previous time, the judge stated that he wanted the defendant "brought back into the court for these contempt matters". He was brought back the next day and, after he and his counsel were afforded opportunity to speak, which they did, punishment was imposed for six incidents.
The appellant makes no assertion that the cross examination was on immaterial matters; therefore, this issue is not before us. However, we point out that the questions were all directly related, as admitted by the defendant, to the murder of James Williamson. Appellant attempted to help a co-defendant by testifying that his brother was a liar. He wrote his mother that Gullett had not hurt Roger, inasmuch as Roger had a deal with the district attorney. At various points in the record, it is apparent that he was pleased with the testimony of Gullett inasmuch as it assisted his friend, *Page 672 
Harden — therefore, bias. Also prior statements in his plea were totally inconsistent with his brother's alleged statement that he alone was responsible for the death of Williamson. All of these matters were proper to be considered by the jury in Gullett's trial in determining whether or not Gullett's statement was a fabrication constituting perjury.
Mississippi Code Annotated § 13-1-13 (1972) provides as follows:
 Any witness may be examined touching his interest in the cause or his conviction of any crime, and his answers may be contradicted, and his interest or his conviction of a crime established by other evidence. A witness shall not be excused from answering any material and relevant question, unless the answer would expose him to criminal prosecution or penalty.
(emphasis added)
Requiring the defendant here to answer the questions did not expose him to criminal prosecution for the murder of Williamson. He had already pled guilty. His Petition for Writ of Habeas Corpus or, in the Alternative, to Withdraw Guilty Plea came months after the term of court expired wherein he had pled and sentence had been entered. The petition must be considered as one under the Post-conviction Collateral Relief Act. It is interesting to note that the petition alleges that a plea bargain agreement was violated because he was charged with grand larceny as a habitual offender in Lafayette County. There is now outstanding an instanter capias on that charge. Assuming the allegation to be true, the state could not prosecute him for the grand larceny and it does not affect the verity of the plea to murder. The Constitutional Fifth Amendment privilege is intended to protect the witness and has no proper application when the witness is not in danger of prosecution or conviction. State v.Milam, 210 Miss. 13, 48 So.2d 594 (1950), suggestion of error overruled 210 Miss. 26, 49 So.2d 806 (1951).
9 A.L.R.3d 994 cites United States v. Gernie (1958, CA2 N.Y.)252 F.2d 664, cert. den. 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073, reh. den. 357 U.S. 944, 78 S.Ct. 1383, 2 L.Ed.2d 1558 in which the following is said:
 [T]he defendants were tried on charges of violating the narcotics laws. Also involved was one Harell, who prior to the trial pleaded guilty to transactions in narcotics and received a 5-year sentence. Thereafter the government called Harell as a witness for the prosecution on trial. He answered several questions, but finally invoked his privilege of self-incrimination and refused to testify further. His refusal was sustained, and the trial judge instructed the jury that the action of the witness was not to be considered by them against the defendants. Subsequently convicted, the defendants unsuccessfully contended on appeal that it was error for the government to call Harell to the stand when it had reason to know that he would refuse to testify under the Fifth Amendment. It was held not only that the government had the right to call the witness, but also that the latter could have been compelled to give testimony. The court mentioned that the judge below should have instructed the witness to testify, since he had already pleaded guilty and could not further incriminate himself.
In the supplement of the same text we find the following:
 Also supporting view that plea of guilty constitutes waiver of privilege against self-incrimination:
 US-Boykin v. Alabama, [1969] 395 U.S. 238, 23 L.Ed.2d 274, 89 S.Ct. 1709;
 U.S. v. Wells (CA9 [1969] Ariz) 430 F.2d 225; U.S. v. Berlin (CA7 [1970] Ill) 437 F.2d 901; U.S. v. Karger (CA1 [1971] Mass) 439 F.2d 1108, cert den 403 U.S. 919, 29 LEd2d 696, 91 SCt 2230; U.S. v. Ready (CA4 [1972] Va) 460 F.2d 1238; U.S. v. Escandar (CA5 [1972] Fla) 465 F.2d 438; Davis v. U.S. (CA3 [1972] Pa) 470 F.2d 1128; Sieling v. Eyman (CA9 [1973] Ariz) 478 F.2d 211; United States v. Jerry (CA3 [1973] Pa) 487 F.2d 600; Todd v. Lockhart (CA8 [1974] Ark) 490 F.2d 626; *Page 673 United States v. Fleming (CA7 [1974] Ill) 504 F.2d 1045; Griffith v. Wyrick (CA8 [1975] Mo) 527 F.2d 109; United States v. Damiano ([1978] CA6 Ohio) 579 F.2d 1001.
We are further of the opinion that when the defendant voluntarily took the stand he waived his right to remain silent and that it was proper to require him to answer questions relevant to the issue involved.
In Autry v. State, 230 Miss. 421, 92 So.2d 856 (1957), the defendant testified in his own behalf, and was then cross examined. After redirect, the defense rested. The state, though, had not rested and in rebuttal recalled the defendant. Objection was made under the Fifth Amendment to the Constitution of the United States and Section 26 of the Mississippi Constitution. The Court, in passing on the matter, had the following to say:
 We do not know from the record whether Autry was still in the witness chair or had taken a seat beside his counsel when the State first requested permission to further examine him. However, we do not think that matters. The State had not closed its case. The State had the right to examine him, as a matter of procedure, by cross-examination or to lay a predicate, subject to limitations, in the sound discretion of the trial judge. It is not claimed here by Autry that, as a matter of procedure, the action was not justified. The argument is that Autry's constitutional rights were violated. Amend. V of the Constitution of the United States provides that no person "* * * shall be compelled in any criminal case to be a witness against himself." Article 3, Section 26, Mississippi Constitution of 1890, contains a provision that in criminal prosecutions an accused "shall not be compelled to give evidence against himself." However, it seems to be recognized by all of the courts that this immunity can be waived by the accused, and that he does so when he takes the stand and testifies on the merits of the case. The rule is stated in this language in 58 Am.Jur., "Witnesses", p. 80, section 96:
 "An accused may waive his constitutional immunity from giving testimony against himself by offering himself as a witness. By electing to testify, the accused subjects himself to cross-examination and impeachment, and makes permissible comment by the prosecuting attorney upon his testimony. When he voluntarily takes the witness stand in his own behalf, he waives his constitutional privilege of not answering proper questions that may tend to convict him of the crime for which he is on trial, and, as has frequently been stated, he subjects himself to the same rules that govern other witnesses, and further, he subjects himself to cross-examination and impeachment to the same extent as any other witness in the same situation.
 The constitutional rule against self-incrimination does not limit the cross-examination of an accused testifying in his own behalf, except that he may not be required to state facts constituting an independent crime, unless the answer to the question also tends to convict him of the offense charged or bears on any issue involved in the case. His voluntary offer of testimony upon any fact is a waiver as to all other relevant facts because of the necessary connection between them all. Under this rule the accused by taking the witness stand in his own behalf waives the constitutional guaranty against compulsory self-crimination not only as to matters about which he has given testimony in chief, but also concerning any matter pertinent to the issue on trial regardless of the extent of the direct examination, and cannot then refuse to testify to any fact which would be competent evidence in the case if proved by any other witness. * * *
 "The waiver by the accused is not partial. Having once cast aside the cloak of immunity, he may not resume it at will *Page 674 
whenever cross-examination may be inconvenient or embarrassing."
92 So.2d at 861-62.
Autry is cited with approval in Chatman v. State, 244 Miss. 659, 145 So.2d 707 (1962); Sanders v. State, 260 So.2d 466
(Miss. 1972); Jones v. State, 381 So.2d 983 (Miss. 1980);Cooley v. State, 391 So.2d 614 (Miss. 1980). It is apparent that the rule announced in Autry remains the law in this state. Therefore, when the appellant voluntarily took the stand, testifying on the matter in connection with the truthfulness of his brother's statement, all of which was intertwined with the death of James Williamson, he waived his Fifth Amendment right and was subject to cross-examination on all relevant and material matters.
Basic fairness dictates that we so hold. In 1951, inMusselwhite v. State, 212 Miss. 526, 54 So.2d 911, (1951), this Court recognized the unfairness of allowing a witness to tell only his version, and stated:
 [W]here a witness in his direct examination voluntarily opens an account of a transaction, he will, on cross-examination, be compelled to complete the narrative notwithstanding his claim of privilege from testifying. He will not be allowed to state some facts as to a transaction and afterwards refuse to give the details as to related facts. 58 Am.Jur., Witnesses, Secs. 94-95; 8 Wigmore, Evidence, Sec. 2276. The opposite rule would permit a witness to give a biased and one sided version of a transaction.
More troublesome is the matter of punishment. Mississippi Code Annotated § 9-1-17 (1972) reads as follows:
 The supreme, circuit, chancery and county courts shall have power to fine and imprison any person guilty of contempt of the court while sitting, but the fine shall not exceed one hundred dollars for each offense, nor shall the imprisonment continue longer than thirty days. If any witness refuse to be sworn or to give evidence, or if any officer or person refuse to obey or perform any rules, order, or judgment of the court, such court shall have power to fine and imprison such officer or person until he shall give evidence, or until the rule, order, or judgment shall be complied with. (emphasis added)
It is apparent that the trial court found the appellant guilty of direct criminal contempt under the first part of the above quoted section and ordered summary punishment. Even though punishment was not imposed until the day following the conclusion of the trial, we find nothing wrong with this procedure. There was no undue delay. The defendant had been advised of his rights and of the procedure concerning contempt before he took the stand. He was also advised on occasion during the course of his cross examination that he was in contempt. It is held that punishment for contempt may be withheld until the conclusion of the trial. The United States Supreme Court approved this procedure in Taylor v. Hayes, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), in an opinion by Justice White. (The case was reversed on other grounds). Undue delay is not tolerated, but waiting until the conclusion of the trial does not violate the tolerance.
Judge Griffith, in Mississippi Chancery Practice § 666 (2d ed. 1940), defined the two classes of contempt provided by the above statute, as follows:
 [T]hese classes are: (1) Those prosecuted to preserve the power and vindicate the dignity of the court, and to punish for disobedience of its orders;
and (2) those instituted to preserve and enforce the rights of private parties to suits. In the first the punishment is for a past offense and must be suffered; in the second the contemnor can discharge himself by paying the costs and expenses and doing what he had previously refused to do. Approximately these two classes are distinguished as criminal and civil, but the same act which constitutes a civil contempt may be also of the other class and vice versa. Criminal contempts are of two kinds, direct
and constructive. The direct contempt is such
disorderly, contemptuous or insolent behavior, *Page 675 committed during the session of the court and in its view and presence or so immediately in its environs, as interferes with the conduct of the public business and with the orderly administration of justice or tends to impair the respect due to the authority of the judicial tribunal; and of course, the behavior mentioned may consist of contemptuous language used as well as of other contemptuous acts. A constructive contempt is an act done, beyond the presence of the court, which tends to obstruct, interrupt, prevent, embarrass, belittle, degrade or corrupt the administration of justice. These direct and constructive contempts are offenses against organized society, are therefore of a nature which requires punitive treatment, and the punishment as to the direct contempt is definitely prescribed in the statute above quoted. (footnotes omitted) (emphasis added).
Judge Robertson reiterated the same rule as recently as February of this year, in Cook v. State, 483 So.2d 371 (Miss. 1986):
 A criminal contempt is conduct that is directed against the dignity and authority of the court, or a judge acting judicially. It arises from an act obstructing the administration of justice which tends to bring the court into disrepute or disrespect. State v. Wingo, 221 Miss. 542, 73 So.2d 107 (1954); see also Gadson v. Gadson, 434 So.2d 1345, 1349 (1983). The essence of the offense is that the defendant wilfully, maliciously and contumaciously refused to comply with a decree of the court. Langford v. Langford, 253 Miss. 483, 485, 176 So.2d 266, 267 (1965).
Cook at 374.
The appellant, by refusing to answer, placed himself in contempt of court. However, the judgment before us is not sufficiently clear and explicit to warrant us in affirming, reversing, annulling or modifying it. Ex Parte Redmond,156 Miss. 582, 126 So. 485 (1930). The judge simply stated that he found the defendant in contempt twenty-seven times for refusing to answer questions, and punished him for six acts. We do not know which six. While the proceeding is a summary one and the judge may act upon that which he personally knows is direct contempt, the judgment of conviction should contain material facts known to the court constituting the contempt. In rendering the judgment and making up the record, the causes for such contempt should be separately stated so as to constitute res adjudicata. Redmond, supra.
We are, therefore, of the opinion that this case should be remanded so that the record of the judgment of contempt may be fully developed. This was the procedure in Redmond, supra. In doing so, we remind the lower court, as it is apparently aware, that any sentence totaling more than six months, even though they be for separate citations, can not be imposed absent a jury trial. Taylor v. Hayes, supra.
CONVICTION AFFIRMED. REMANDED FOR PROCEEDINGS IN ACCORD WITH THIS OPINION.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and ANDERSON, J., concur.
PRATHER, DAN M. LEE, ROBERTSON and SULLIVAN, JJ., dissent.