260 So.2d 466 (1972)
Donald Lamar SANDERS
v.
STATE of Mississippi.
No. 46773.
Supreme Court of Mississippi.
April 10, 1972.
*467 Roland C. Lewis, Jackson, W.M. Conerly, Vicksburg, for appellant.
A.F. Summer, Atty. Gen. by John M. Kinard, Sp. Asst. Atty. Gen., Jackson, for appellee.
ROBERTSON, Justice:
Donald Lamar Sanders was indicted, tried and convicted in the Circuit Court of Warren County of murdering Billy Ray Whitehead, and sentenced to life imprisonment in the State Penitentiary.
On December 31, 1970, Sanders, who was 24 years of age, and his 20-year old friend, Alvin Breland, were celebrating New Year's Eve and were making the rounds of the night clubs and drinking establishments in Vicksburg. Sanders and Breland arrived at Sportsman's Inn about 12:30 A.M., and Sanders admitted that he drank at least 6 or 7 beers while there. When the Inn closed about 3:30 A.M., appellant, with J.B. Sanders, his wife, his sister-in-law and Breland, left in appellant's car.
A short distance from the Inn, appellant stopped his car and offered a ride to Bonita Whitehead and Charlotte Delamar, whose husbands had left them at Sportman's Inn, and who were walking along the road at that time. The two girls refused the ride and appellant and his friends, after going by the Beechwood and finding it closed, went to Jo-Anna's Cafe. A few minutes later Bonita Whitehead and Charlotte Delamar came in with Billy Rich, a Coast Guardsman. Sanders testified that he called Rich outside the cafe and told him that the two women were married, and that Billy Ray Whitehead, Bonita's husband, "can get pretty upset sometimes," and that "It's best you just leave."
J.B. Sanders and Billy Rich testified that appellant actually threatened Rich and brandished a pocketknife. Shortly thereafter appellant took J.B. Sanders, his wife, and sister-in-law, and Breland, to J.B. Sanders' home. There appellant had a drink of vodka, was asked to leave by J.B. Sanders, did leave and without any reason tried to start a fight with Breland outside of the J.B. Sanders home. Mrs. Sanders called to appellant and Breland from an upstairs window and told them that if they didn't leave she would call the police. Appellant and Breland came back to Jo-Anna's Cafe in appellant's car.
In the meantime, Billy Ray Whitehead had come to Jo-Anna's Cafe to take his wife home. He came out of the Cafe and after talking with appellant for a few minutes appellant got into a fight with Whitehead. Breland testified that Whitehead was getting the best of Donnie and he pulled Whitehead off of Donnie. Whitehead went back inside the Cafe and sat in a booth next to his wife, which booth was next to a plate glass window on the front of the Cafe. Gary and Charlotte Delamar were sitting across the table in the same booth with the Whiteheads and all ordered breakfast.
Breland related what then took place:
"A. Yes, sir. So we got in the car. And we sat there for about a minute and Donnie said  he said, `Alvin, he hurt me.' I didn't say nothing. `I'm going to kill him.'"
......
"Q. He was going to kill who?
"A. The Whitehead boy, cause he hurt him. Well, we went on down the *468 road about a hundred and fifty feet and he said it again. He said, `Alvin, he hurt me. I'm going to kill him.' I turned and said, `Donnie, ain't no need in killing a fellow because he's just a better man than you are. He whipped you. Leave it like that and go on.' So we got on down the road there. He stopped at the Pittman's Store down there."
Sanders instructed Breland to get the deer rifle out of the trunk of the car. Breland did so, and Sanders put one round in the chamber and Breland put 5 or 6 rounds in the magazine. Sanders then turned the car around and drove past Jo-Anna's Cafe. He drove about 200 yards past the Cafe, made a "U" turn and headed back north.
According to Breland, Sanders drove very slowly past Jo-Anna's Cafe, stuck the deer rifle out the window on Breland's side and fired one shot through the plate glass window of the Cafe, which was about 20 feet away. The shot went through the plate glass window, a partially opened inside curtain, went through Billy Ray Whitehead's head and broke a pie display case on the counter.
Charlotte Delamar testified that she felt ill, stepped outside the cafe, heard the shot, turned and saw Sanders, the appellant, quickly drive away in his car. She was positive that she saw only one person in the car and that person was Sanders.
Breland testified that he had slumped down on the front seat almost to the floorboard, that he was afraid of what Sanders might do and was getting out of the way of the gun.
Sanders drove to his married sister's home and went to bed. Breland remained up and greeted deputy sheriff Ed Reed when he came to pick them up about 6:30 A.M.
Reed testified that when he went to the Whatley home to pick up Sanders and Breland that:
"[W]hen I said what had happened, the Breland boy spoke up and said `I tried to get him not to do it.' That's the statement that the Breland boy made in my presence.
"Q. Said what?
"A. Said, `I tried to get Donnie not to do it.' That's the words that he said."
In his assignment of errors, appellant contends that his constitutional rights were violated when the state's attorney cross-examined him about his silence and failure to testify at the preliminary hearing. At the preliminary hearing Breland testified that Sanders fired the fatal shot. Sanders admitted that he remained silent at the preliminary hearing on the advice of his attorney. It was not necessary for the county attorney to cross-examine the appellant on his failure to testify at the preliminary hearing, and we do not condone that procedure. However, defense counsel did not object, and thus appellant waived his right to raise this point for the first time on appeal.
In May v. State, 211 So.2d 845 (Miss. 1968), there was a similar assignment of error which we discussed and ruled on, as follows:
"The first assignment is that the court erred in allowing the state to prove and argue that appellant maintained his silence after the shooting and gave no explanation thereof in spite of the fact that his defense at the trial was that the shooting was an accident. The state did prove by some of the officers that when the appellant was arrested and in their custody he made no statement as to how the shooting occurred and consequently did not claim at that time that it was an accident.
......
"However, appellant took the stand to testify in his own behalf. Of course, he did not have to testify. It is generally held, and has been specifically held by *469 this Court, that when the defendant voluntarily takes the witness stand, he waives all right to remain silent and is required to answer any questions relevant to the issue involved. In Autry v. State, 230 Miss. 421, 92 So.2d 856 (1957), this Court recognized, approved, and cited the rule as stated in 58 Am. Jur. Witnesses section 96 at P. 80. It was held that the waiver for the accused when he takes the stand is not partial, and, having once cast aside the cloak of immunity, he may not resume it at will whenever cross-examination may be inconvenient or embarrassing." (Emphasis added). 211 So.2d at 846.
Since appellant voluntarily took the stand and testified in his own defense, he waived his right to remain silent and could be required to answer any question relevant to the issue involved.
In his second assignment of error appellant contends that the state committed reversible error "by questioning its witness, Alvin Breland, concerning his testimony at the preliminary hearing." On redirect examination the District Attorney asked two questions and received two answers, as follows:
"Q. And did you testify in that preliminary hearing?
"A. Yes, sir.
"Q. And was your testimony the same as it is here today?
"A. Yes, sir."
Defense counsel did not object at that time, and it is too late to object now.
The next assignment of error was that the trial court "committed reversible errors in its decisions relating to the testimony of Charlotte Delamar." After her direct examination, when this witness was tendered to appellant for cross-examination, defense counsel immediately asked Mrs. Delamar if she had been sworn as a witness, and she replied "No, sir." Appellant moved for a mistrial, and the court overruled the motion. The court then questioned the witness: "I was under the impression that you advised the Court that you had been sworn in." To which question, the witness replied, "Oh, I thought you meant before. I didn't know today."
The court immediately swore her in, both as to testimony which she had already given and that which she would give. Defense counsel then proceeded with his cross-examination. The next morning the state moved to strike all of Mrs. Delamar's testimony, to instruct the jury to disregard it, "and to recall her and to have her testimony given under oath as provided by law." Before the court ruled on this motion, it addressed a question to the defense counsel as to when he had found out that the witness had not been sworn. Defense counsel answered:
"No, sir, I had no inkling. It was pointed out to me by one who was listening in the Courtroom. And I don't think it would be incumbent upon defense counsel to see that the witnesses are properly sworn in."
The Court then commented:
"Well, of course, where the incompetency of the witness is known to counsel, by virtue of the fact that he hasn't been sworn, and you permit the witness to testify knowing all along he hasn't been sworn, of course, that constitutes a waiver of any objection to the witness' testimony. But I'll take it for granted that you were not aware of it, and did not learn of it."
The Court then sustained the state's motion, and instructed the jury to disregard any previous testimony by this witness. Appellant moved for a mistrial "in that having her repeat her testimony in the presence of the jury would tend to prejudice the jury against the Defendant." The court overruled the motion for mistrial.
We think the court was justified in questioning defense counsel about when *470 he found out that the witness had not been sworn. In addition to representing his client, defense counsel was an officer of the court, as are all lawyers, and was duty bound to promptly inform the court when he discovered that the witness had not been sworn. Even though this testimony was repetitious, we think that the court was also correct in overruling the motion for a mistrial on that ground. If a mistrial were granted in every case where there was repetitious testimony, no trial would be finished and no transcript would ever be completed. The writer of this opinion has never read a record where there was not considerable repetition; even we judges are sometimes guilty of this sin.
Appellant next contends that: "The lower court committed reversible error in allowing in evidence the alleged confession of defendant."
On redirect examination of Sheriff Paul Barrett, the county attorney asked questions and received answers as follows:
"Q. Did Donald Sanders say something to you about the shooting?
"A. Yes, sir.
"Q. How many statements did he make to you about the shooting?
"A. Two.
"Q. What were they?
"A. The first one was that, he sent me word by a member of his family that he wanted to talk to me. I went up. He told me that Breland did the shooting. The next day he sent word by the same member of his family that he wanted to see me again. I went back to the jail, he said, `I shot, I don't know why, but maybe to scare somebody.'"
Appellant objected. The court sustained the objection and defense counsel made no further comment. Appellant was in error when he charged that this testimony was admitted into evidence. Defense counsel did not request the court to instruct the jury to disregard this testimony, and the court cannot be held in error for an omission that defense counsel did not call to the court's attention. Defendant later took the witness stand in his own defense and admitted, on cross-examination, that he did make two statements to the sheriff, that he sent for the sheriff on both occasions and volunteered the statements.
In Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Supreme Court of the United States ruled:
"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. See United States v. Knox, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); cf. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truthtesting devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

"The shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements." (Emphasis added). 401 U.S. at 225-226, 91 S.Ct. at 645-646. 28 L.Ed.2d at 4-5.
The fifth assignment of error was that the court committed error "by allowing testimony as to statements made by Alvin Breland regarding the guilt of defendant, such statements being made out of the presence of the defendant."
*471 Deputy Sheriff Ed Reed explained what happened when he went to the Whatley home to pick up the defendant and Alvin Breland, shortly after the shooting:
"And when I said what had happened, the Breland boy spoke up and said, `I tried to get him not to do it.' That's the statement that the Breland boy made in my presence.
"Q. Said what?
"A. Said, `I tried to get Donnie not to do it.' That's the words that he said."
No objection of any kind was made by defense counsel to this testimony. The trial court cannot be held in error for admitting testimony that was not objected to. All of us have 20/20 vision in hindsight. It's a pity that our vision is not also perfect in foresight. It is easy for appellate counsel who did not participate in the actual trial to pick flaws in the battle plan followed by trial counsel in the trial.
The last assignment of error was that: "The state's proof consists of circumstantial evidence and the state did not prove beyond a reasonable doubt and to a moral certainty the exclusion of every other reasonable hypothesis of innocence of the defendant."
There is no merit whatsoever in this assignment of error. The state's proof in this case consisted of both direct and circumstantial evidence. One eyewitness testified that he saw the appellant fire the gun; two other eyewitnesses testified that they saw the appellant leave the scene in a great hurry immediately after the shot was fired.
The defendant was granted 12 instructions. In these instructions the defendant got all the mileage that the traffic would bear out of what was meant by "reasonable doubt"; and that:
"[T]he evidence on the part of the state, on the whole, must be such as to produce a moral certainty of guilt to the exclusion of every reasonable doubt of the guilt of the Defendant, and unless the evidence has this effect, the jury must acquit;"
and that:
"[T]he state must make out its case, by the evidence, to a moral certainty, and it is not until the state has done this that the accused is required to do anything; and then he need only, from the whole body of the evidence adduced, for him and against him, raise a reasonable doubt of his guilt to entitle him to an acquittal."
The guilt or innocence of the defendant was submitted to the jury to decide after all witnesses offered by the State and the defendant had testified in detail. The jury was correctly instructed as to the law. Applying the law to the facts of this case, the jury was justified in reaching the verdict that it did.
The conviction and judgment are affirmed.
Affirmed.
RODGERS, P.J., and JONES, PATTERSON and INZER, JJ., concur.