305 So.2d 23 (1974)
Charles SALEM, Appellant,
v.
STATE of Florida, Appellee.
No. 74-702.
District Court of Appeal of Florida, Third District.
December 3, 1974.
Rehearing Denied January 14, 1975.
*24 Horton, Perse & Ginsberg, Nicholas J. Capuano, Miami, for appellant.
Richard E. Gerstein, State's Atty., and N. Joseph Durant, Asst. State's Atty., for appellee.
Before PEARSON and HENDRY, JJ., and RAWLS, JOHN S., Associate Judge.
RAWLS, JOHN S., Associate Judge.
Appellant Salem challenges a judgment of direct criminal contempt.[1]
The salient point posed is whether Charles Salem, under the facts of this case, had a constitutional right to refuse to answer questions propounded to him by the state, which had subpoenaed him as a witness in the trial of one Hatten.
As hereinafter explicated, Salem had previously suffered a judgment of contempt by reason of three appearances before the Dade County Grand Jury. The instant appeal is solely directed to judgment of contempt imposed because Salem refused to testify as a witness subpoenaed by the state in the criminal trial of Hatten.
The grand jury of Dade County conducted an extensive investigation into certain land transactions in connection with the construction of the Homestead Extension of the Florida Turnpike. Louis G. Hatten and appellant Salem, law partners, were personally involved in the subject of the investigation. Hatten was ultimately indicted by the grand jury for making a false notary's certificate. During the course of the investigation, Salem was granted immunity from criminal prosecution pursuant to Florida Statute 914.04, and advised by the trial judge that he was immune as to any and all charges stemming from, and relevant to, the testimony given or to be given, except perjury. Salem appeared before the grand jury on November 20, 1973; November 27, 1973; and January 29, 1974, and pursuant to intense interrogation, gave testimony regarding the land transaction, including Hatten's participation in same, and also testified as to his, Salem's, financial affairs. Although he was assured that his testimony was secret, at a subsequent date upon petition of the Miami News and the Miami Herald, the trial judge made these proceedings public.[2] On February 5, 1974, the grand jurors of Dade County moved the trial judge to enter an order requiring Salem to show cause why he should not be held in contempt of the grand jury on the grounds that Salem had been evasive and demonstrated a total lack of candor. On March 14, 1974, the trial judge adjudicated Salem guilty of contempt of the grand jury and indirect criminal contempt of the court for "... giving false, evasive and unresponsive testimony before the Grand Jury... .", sentenced him to pay a fine of $5,000.00 and to serve a term of sixty days in the Dade County Stockade.[3]
The present controversy arose out of the trial of Louis G. Hatten. Salem was subpoenaed as a witness for the state. Upon advice of counsel, Salem asserted his right not to testify in the trial proceedings pursuant *25 to the provisions of the Fifth Amendment of the U.S. Constitution and Article I, Section 9, of the Florida Constitution, 1968. At this juncture the state offered to immunize the witness and much discussion was had as to the effect of the proffered immunity and the ramifications of the immunity previously granted Salem. On the following day the state offered a written grant of immunity to Salem, viz:
"The State offers Charles S. Salem immunity for any perjury committed before the Dade County 1973 Spring Term Interim Grand Jury except for any perjury, false or evasive testimony determined or will be determined by the Honorable Harold Vann, Circuit Judge, to have been given to said Jury, said determinations by Judge Vann to be confined to the testimony given by Charles S. Salem to said Grand Jury on November 20, 1973, November 27, 1973, and January 29, 1974, and not on any testimony given in the above-styled proceeding.
"The state will not immunize Charles S. Salem for any perjured, false or evasive testimony given in the above-styled proceeding including any testimony in the above-styled proceeding determined to be false, evasive, or perjured by use of testimony before said Grand Jury."
After hearing legal arguments from all parties, the Court ordered Salem to testify. The witness, after taking the stand, refused to testify on the grounds that his answer might tend to incriminate him. The witness then stated to the court as to his fears of being further prosecuted, viz:
"MR. SALEM: ... I have been subjected to very severe treatment at their hands with respect to my testimony in front of the Grand Jury.
"I don't want to comment on the substitive point of my contemptment, except to say that the Judge who found me in contemptment did solely on the basis of reading my testimony.
"THE COURT: That is another matter.
"MR. SALEM: Your Honor, it shows what I am afraid of today.
"THE COURT: How can it be relevant?
"MR. SALEM: Well, it shows if the State with its awsome [sic.] power decides to pursue the matters with me, to make me defend myself and, so to speak, run for my life, it is the same as putting me in a position of having to defend myself against lawful indictment.
"I am not worried about lawful perjury. I will not commit perjury. What I am worried about today is any subsequent situation may become a memory contest on my part, to use my statements today or later and screen them against statements I made six, five months ago over events which occurred during the past two years from that date. That is my reason for my position, Judge, and it stems from an honest fear on my part that I have something to be worried about."
After further dialogue between the Court and witness Salem, the instant judgment of contempt was entered.
That Salem had a real and substantial fear of future prosecution by the state for perjury as a result of testifying at the Hatten trial is amply supported by this record. At the outset the state motioned the trial court to make Salem the court's witness. The testimony sought from Salem by the state was to be weighed against testimony he had given in his three appearances before the Grand Jury, which testimony had already been judicially decreed to have been false. If Salem testified at the instant trial as he had done in any one of his appearances before the grand jury, the state was well prepared to proceed with a perjury prosecution against him by comparing his testimony with other conflicting statements under oath in his prior *26 appearances before the grand jury. The state's position is repeated in this record as evidenced by such statements as:
"Number one, we do not want to give Mr. Salem immunity with the matter before Judge Vann, we do not want to get in between a rock and a hard place as to his prior testimony before the Grand Jury. He has been punished for that and we don't intend to bring out other proceedings before the Grand Jury." [Page 14 of the transcript, hereafter referred to as TR.]
"We would not render him immune from any statement which is false and is in conflict with the Grand Jury testimony." [TR 17]
"... Now, if he says something untrue today, that was in conflict with what he said before the Grand Jury, we do not immunize him for that." [TR 18]
"Your Honor, some of what he said was truthful and some of what he said was false before the Grand Jury." [TR 19]
"... I do say he would be prosecuted for any perjury before the Court... ." [TR 21]
"In that instance, again, it is an entirely different situation. If he says something here today that is false, and we used prior Grand Jury testimony which is truthful to show this is false, that has nothing to do with perjury before the Grand Jury, that has to do with perjury here for which we are not immunizing him." [TR 25]
"Judge, the fact that we have filed a motion to make him a Court's witness does not  we wanted to be able to cross examine." [TR 30]
"If the State found that there was truth in the testimony, the testimony before the Grand Jury, we would be bound to use that truth in any subsequent prosecutions for perjury that is committed in this proceeding." [TR 83]
The trial judge in discussing the issue stated to the appellant:
"Now, I do not believe that you in good faith believe that the State, were you to disclose the truth, would simply turn around and charge you even if some of your testimony varied in some degree from the evidence that the State possesses or believes it possesses and even if your testimony or some of your testimony was inconsistent, not only with one of your prior statements, but inconsistent with all four prior statements on gut and material issues of your testimony for which the State has grave concern and which the State apparently wants to elicit from you and you don't have to kid yourself, you are a lawyer and you know what the state's case is about in this matter and you know what testimony they are looking to elicit from you" [E.S.]
The citizens of this state and nation have the co-equal rights of freedom of speech, freedom of the press, and freedom from self-incrimination. Each stands in equal dignity before the law. The right of silence has origins which go back to the 13th Century when the English people resisted a general inquisition into heresy.[4] The privilege came to this continent as a part of the legal heritage of our early settlers. In 1689, William Bradford, the man who introduced the art of printing to the middle provinces of America, was interrogated by the governor of Pennsylvania as to his printing the Charter of the Provinces. Bradford's answer was: "Governor, it is an impracticable thing for any man to accuse himself; thou knows it very well."[5] This common law right was engrafted into our Federal Constitution by adoption of the Fifth Amendment and into our State Constitution where it presently appears in Article I, Section 9. Although oftentimes termed a privilege, the freedom to remain silent is a right which possesses the same dignity as each other constitutional right retained by the people and not *27 granted to the sovereign. A citizen of this state and nation should not be compelled to convict himself by "... torture nor an oath nor the threat of punishment such as imprisonment for contempt... ."[6]
There are some segments of our society that condemn the assertion of the right of silence by such phrases as "hiding behind the Fifth"; yet concurrent with such utterances, eulogize the co-equal constitutional rights of free speech and free press. When the clamor of the times demand execution of the right of silence, the way is paved to bury the right of free speech, freedom of the press, freedom of search and seizure, and the constitutional rights that our forefathers based upon a bath of blood preserved for us, until the day we ourselves elect to destroy them. Those who would seek to crucify a citizen for asserting his constitutional right against the state using him to prosecute himself should understand that, if successful, the co-equal rights of free speech and freedom of the press may not long survive.
United States v. Wilcox is in point.[7] There, the defendant Wilcox sought to force one Maruzewski, to testify. The prospective witness had sought and received the protection of the Fifth Amendment. The background related in the opinion reveals that primarily as a result of Maruzewski's testimony, Wilcox was convicted at his first trial. On appeal this conviction was reversed and remanded for a new trial because of a matter totally unrelated to the issues in the instant case. A mistrial was had on the second trial. At Wilcox's third trial, Maruzewski was excused from testifying by the trial judge upon claiming the Fifth Amendment privilege against self-incrimination. The trial judge, in excusing Maruzewski from testifying, found that the witness could stand upon this constitutional right without being contemptuous and that his testimony given at the first trial could be introduced to the jury. The Fifth Circuit Court of Appeals in affirming the trial court's judgment stated:
"Thus the aphorism that one cannot take the Fifth Amendment on the ground that if he testifies he will perjure himself applies only as an excuse for not testifying initially. It does not mean that having once testified, the Fifth Amendment is not available to avoid giving further testimony which might expose the witness to substantial risk of prosecutions growing out of the prior testimony."
The state vigorously asserts that it has proffered immunity to Salem as to any future prosecution for perjury by him as to his prior appearances before the grand jury, and thus he cannot avail himself of his right to silence pursuant to provisions of the State and Federal Constitutions. The District Court for the Southern District of New York was confronted with a similar factual situation in the case of In re Bando.[8] Bando and Miranti had been indicted for conspiring to obstruct justice by injuring Victor Riesel (a prospective witness before a grand jury investigating racketeering). Bando made a detailed statement to the F.B.I. disclosing the operations of the conspiracy, and Miranti made a like statement before the grand jury which indicted them. On the basis of these statements and other evidence Bando and Miranti were convicted of the crime charged. While serving their sentences, Bando and Miranti were removed from the federal penitentiary and brought to New York ostensibly to testify on behalf of the government as to other alleged conspirators. Apparently, they indicated that they were unwilling to testify, for trial was adjourned on the government's motion and the grand jury which had returned the original indictments was reconvened to investigate the alleged intimidation of witnesses. Both Bando and Miranti were then brought before the grand jury and asked to acknowledge their previous statements made to the F.B.I. and the grand *28 jury respectively. They refused to make such acknowledgments and invoked the privilege against self-incrimination. The trial court determined that the requested answers could not be incriminatory because the defendants already had been indicted and tried for conspiring to commit the crimes; and upon their continued refusal to make any statements, it summarily convicted them of contempt. The trial court, in referring to Bando, stated this was "not a case of constitutional silence", but was "a case of underworld lockjaw" and proceeded to sentence Bando to five years for contempt. On appeal, the United States Court of Appeals, Second District,[9] in reversing stated:
"We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute. Such a rule would require the trial court, in each case, to assess the practical possibility that prosecution would result from incriminatory answers. Such assessment is impossible to make because it depends on the discretion exercised by a United States Attorney or his successor.
* * * * * *
"This disclosure of information to the FB'I (here in the nature of a confession), while admissible as evidence in a subsequent trial of the witness, if voluntarily made, does not constitute a waiver of the witness' privilege against self-incrimination even in response to the same questions before a grand jury. It can be argued that reiteration of the prior voluntary statement is not incriminating because that statement would be admissible against the witness at trial. But reiteration adds to the credibility of the statement, United States v. Malone, D.C.N.D.Cal., 111 F. Supp. 37, 39, and if construed as a waiver could lead to additional questions requiring answers which further implicate the witness."
We conclude from this record that Salem was constitutionally entitled to assert his "right of silence". As stated by the revered late Justice Glenn Terrell, speaking for the Supreme Court in State v. Sullivan:[10]
"The right of immunity against self incrimination is preserved by Section 12, Declaration of Rights, Florida Constitution, F.S.A., and by Amend. V, Federal Constitution. Section 918.09, also permits one accused of crime to take the stand in his own behalf. This Court has repeatedly recognized and preserved one's immunity from self incrimination. Ex parte Senior, 37 Fla. 1, 19 So. 652, 32 L.R.A. 133; Stinson v. State, 76 Fla. 421, 80 So. 506; Wallace v. State, 41 Fla. 547, 26 So. 713. These cases not only exempt one from answering questions that directly incriminate but they extend the rule to questions that in anywise tend to incriminate."
The judgment of contempt is reversed.
PEARSON, Judge (dissenting).
I respectfully dissent because it seems to me that the rule advanced here that a witness who has testified before a grand jury may refuse to testify at a trial on the same subject matter because he fears prosecution for perjury is too broad. It seems to leave an unnecessarily big loophole that the appellant has been able to crawl through. I can wholeheartedly agree with the statements contained in the opinion as to the sanctity of the fifth amendment which guarantees a defendant the right not to testify on subjects which might lead to prosecution for crimes other than perjury. But I cannot agree that the fear of prosecution for perjury upon questions not yet asked is a ground for refusing to testify.
*29 The appellant has received full immunity from prosecution for the subjects he testified about before the grand jury. He asked for, and received, full immunity from prosecution for any testimony covering the matters that he was to be questioned about at the trial. This leaves only his fear that if he performed his duty as a citizen and testified truthfully at the trial that he might be subject to perjury because he testified differently before the grand jury. The quoted grant of immunity at the trial was sufficient to protect the appellant from all but false statements at the trial. The prior contempt for giving false and evasive testimony before the grand jury does not govern this case. The courts can adequately protect the appellant from unfair prosecution for any honest testimony given at the trial. I think that a blanket excusal from testifying at this stage is not a proper way to protect the appellant.
I agree with the trial judge's determination that the appellant's refusal to testify solely because he feared a "memory contest" was a sham and an insufficient ground to avoid telling the truth.
I would affirm.
NOTES
[1] In this summary proceeding, the trial judge sentenced appellant to one year imprisonment. During oral argument, counsel for the state conceded that a sentence exceeding six months was impermissible. See Aaron v. State, 261 So.2d 515 (1 Fla.App. 1972); and Aaron v. State, 284 So.2d 673 (Fla. 1973).
[2] Honesty is equally becoming of the government as it is of its citizenry.
[3] An appeal from this judgment of conviction by Salem is pending in this Court.
[4] Rogge, The First and the Fifth, (1960).
[5] Griswold, the Fifth Amendment today, at 5 (1955).
[6] Id. at 8.
[7] United States v. Wilcox, 450 F.2d 1131 (5th Cir.1971).
[8] In re Bando, 20 F.R.D. 610 (D.C. 1957).
[9] United States v. Miranti, 253 F.2d 135 (1958).
[10] State v. Sullivan, 37 So.2d 907 (Fla. 1948).