I respectfully dissent to that portion of the court's majority opinion regarding the defendant's assertion of his privilege against self-incrimination. As a witness Hentz was entitled to assert this constitutional right.
The law on this proposition is well established. Article 3, Section 26 of the Mississippi Constitution of 1890 provides that "[i]n all criminal prosecutions the accused . . . shall not be compelled to give evidence against himself." Likewise, the United States Constitution, Fifth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ." *Page 676 
Both constitutional provisions guarantee the privilege against self-incrimination to a witness, as well as an accused. Haralsonv. State, 314 So.2d 722 (Miss. 1975). Additionally, Miss. Code Ann. § 13-1-13 (1972) guarantees that a witness shall not be required to answer a question where "the answer would expose him to criminal prosecution or penalty."
An accused or witness may waive his constitutional privilege against self-incrimination when he voluntarily takes the stand and testifies on the merits of the case. Autry v. State,230 Miss. 421, 92 So.2d 856 (1957). A waiver is made unless the privilege is claimed. State v. Myers, 244 Miss. 778,146 So.2d 334 (1962). The privilege also extends to any civil or criminal proceeding, formal or informal, where the answers might incriminate him in future criminal proceedings. Lefkowitz v.Turley, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973).
This appeal addresses two questions about the privilege against self-incrimination:
(1) Was the defense witness entitled to claim the privilege against questions regarding details of a crime to which he pled guilty; and
(2) If he was entitled to claim the privilege under those circumstances, did this witness waive the privilege by answering some of the questions.
 I.
The record here reveals that Larry Hentz pled guilty after plea bargain, to the murder of James Williamson. Thereafter, Larry Hentz filed a petition for writ of habeas corpus, or in the alternative, a motion to withdraw his guilty plea alleging the state violated the agreement to dismiss a larceny charge against him upon his plea of guilty to murder. The petition to set aside his guilty plea was pending at the time Hentz testified as a defense witness in the Gullett trial. As a witness Hentz testified to the fact that he was convicted for Williamson's murder, but he invoked the Fifth Amendments to questions addressed to the details of the crime from which he was attempting to withdraw his guilty plea. (See Exhibit A attached) Appellant argues that he has a constitutional right to protect himself from self-incrimination since he may stand trial for capital murder in the event the court allows him to withdraw his former guilty plea.
The majority opinion today holds that a constitutional privilege afforded by the Fifth Amendment has no proper application when the witness is not in danger of prosecution after his actual conviction. Citing State v. Milam, 210 Mill. 13, 48 So.2d 594, Suggestion of Error Overruled, 210 Miss. 26, 49 So.2d 806 (1950).
I respectfully disagree. The privilege should apply where, as here, the witness is challenging his guilty plea upon which the conviction is based. Hentz's Fifth Amendment rights were valid and outstanding; he could exercise them and refuse to testify based upon this constitutional guarantee.
This position has been taken by other courts. In King v.State, 353 So.2d 180 (Fla.Dist.Ct. 1977), Dale King was adjudged guilty of direct criminal contempt for refusing to testify as a prosecution witness in the trial of a co-defendant after testifying in his own trial. The Court held:
 King was found guilty on October 9, 1976, of charges growing out of the same incident that he now claims privilege. A notice of appeal from his conviction was timely filed on November 18, 1976. On January 5, 1977, King was called to testify as a prosecution witness against his codefendants. At that time, his appeal was pending and his rights under the Fifth Amendment to the United States Constitution were valid and outstanding. See Mills v. United States, 281 F.2d 736 (4th Cir. 1960); and cf. Salem v. State, 305 So.2d 23 (Fla. 3d DCA 1974); Saunders v. State, 319 So.2d 118 (Fla. 1st DCA 1975); and United States v. Wilcox, 450 F.2d 1131 (5th Cir. 1971).
Additionally, the witness Hentz was advised by his attorney that "there were possibly cases pending against him, or may be pending against him in the future, by way *Page 677 
of possible pleas being set aside and so forth." With such warning to the witness, his privilege should be more guarded. Ultimately the determination of what is incriminating has to rest with the witness, not the judge. Mason v. United States,244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198 (1917). The general law on this point is discussed in 81 Am.Jur.2d, Witnesses § 52.
 A witness may not arbitrarily refuse to testify without existence in fact of a real danger, and the court is first charged with the responsibility of determining whether that real danger exists. The court must be able to discern from the character of the question and the other facts adduced in the case some tangible and substantial probability that the answer of the witness might help to convict him of a crime. It has been laid down that when a witness refuses to answer a question for the alleged reason that his answer would incriminate him, his answer is not conclusive with respect to the incriminating character of the evidence sought to be elicited, and he may be required to answer if, by any inquiry which does not invade his immunity, it is made to appear to the trial judge that his answer would not have the tendency claimed by him.
 . . . . .
 A witness interposing a claim of privilege against self-incrimination is not required to prove the hazard of criminal prosecution, because otherwise he would be compelled to surrender the very protection which the privilege is designed to guarantee.
 . . . . .
 But if it appears that any direct answer to a question would have a tendency to incriminate the witness, and if a disclosure of any facts or circumstances to show how the answer would affect him would destroy the protection afforded by the law, the witness is the sole and exclusive judge of whether the answer on his part would in actuality have a tendency to incriminate him. (Emphasis added)
I submit that Hentz was entitled to assert his privilege against self-incrimination under these facts.
 II.
The remaining question addresses whether Hentz waived his privilege by answering some questions directed toward the details of the crime. In my view the record does not show any waiver. The majority opinion recites some questions of the prosecutor. Attached to this dissenting opinion as Exhibit A are other questions quoted from this record. Clearly a witness may waive his privilege as indicated in Musselwhite v. State, 212 Miss. 526, 539, 54 So.2d 911, 915 (1951), wherein this Court stated in dicta:
 Where a witness in his direct examination voluntarily opens an account of a transaction, he will, on cross-examination, be compelled to complete the narrative notwithstanding his claim of privilege from testifying. He will not be allowed to state some facts as to a transaction and afterwards refused to give the details as to related facts. 58 Am.Jur. Witnesses § 94-95; 8 Wigmore, Evidence, § 276. The opposite rule would permit a witness to give a biased and one-sided version of a transaction.
However, this record does not reflect a waiver. For these reasons, I would reverse and render this conviction and discharge the defendant.
DAN M. LEE, ROBERTSON and SULLIVAN, JJ., join this dissent.
 EXHIBIT A
On cross-examination, the following question was asked:
 Q. Do you want to tell the jury what was found in your possession when you were transported to the Lafayette County Jail?
 A. I take the Fifth on that.
 Q. Mr. Hentz, is it a fact that you were found with hacksaw blades when you arrived at the Lafayette County Jail for you to try to escape to escape prosecution *Page 678 
of the murder of James Williamson?
 A. No sir.
 Q. That's not true.
 A. I never tried to escape.
 Q. Did they find hacksaw blades.
 A. I plead the Fifth.
 Assistant District Attorney:
 Mr., Your Honor, I ask the court to direct the witness to answer the question.
 COURT: Ask it again Mr. Kelly.
 Q. Is it a fact that when you were transported from the DeSoto County Jail to Lafayette County Jail in July of 1983 that when you were searched at the Lafayette County Jail, that you had hacksaw blades in your possession?
 A. I take the Fifth on that.
 THE COURT: Mr. Hentz I order you to answer that question. You may confer with your attorney.
 A. I'm still going to take the Fifth.
 THE COURT: You are not going to answer that question, is that correct Mr. Hentz?
 A. WITNESS: That is right.
 THE COURT: I am compelled then to find you in contempt of court.
 The prosecution questioned Hentz further:
 Q. You told the jury you got high in jail.
 A. Yes sir.
 Q. What did you get high on?
 A. Marijuana
 * * * * * *
 Q. I see, you just used your money to roll dope and smoke it up. By the way, is that against the law.
 A. Sure it's against the law.
 Q. Are you admitting to that?
 A. I admit to the law.
 (R. 42-45).
The prosecution then questioned Hentz as to his plea of guilty to the murder of Williamson. Hentz testified: "It was plead guilty or get the gas chamber." Hentz stated, "I pled guilty to that charge to keep from going to the gas chamber. . . . I definitely wasn't guilty." (R. 47)
Appellant was then questioned with respect to his previous plea of guilty for the murder of James Williamson as follows:
 BY THE STATE: Now, you plead guilty to the murder of James Williamson in the Circuit Court of Tate County, didn't you?
 (At this point in the proceedings, there is a conference between the witness and his attorney.)
 BY THE WITNESS: Based on the circumstances, I take the Fifth.
 BY THE COURT: Mr. Hentz, I am compelled to direct you to answer that question. You have already been convicted on that charge.
 BY THE WITNESS: All right. Yes, sir.
 BY THE STATE: After you pleaded guilty in Tate County, you were interviewed by Mr. Jimmy Dees and Mr. Jay Clark and Mr. Thomas McCloud from the Mississippi Highway Patrol, weren't you?
 BY THE WITNESS: Yes, sir.
 BY THE STATE: And you gave them a statement relating to your involvement in the death of James Williamson, didn't you?
 BY THE WITNESS: No, sir.
 BY THE STATE: You did not.
 BY THE WITNESS: I gave them a statement.
 BY THE STATE: And it didn't involve you in the murder of James Williamson at all?
 BY THE WITNESS: I didn't give them any statement — I gave them a statement of what they wanted to hear.
 BY THE STATE: Oh, you lied to them.
 BY THE WITNESS: I am going to have to plead the Fifth on this.
 BY THE COURT: At this point, Mr. Hentz, I must direct you to answer that question.
 BY THE WITNESS: All right.
 (R. 52-53) *Page 679 
 BY THE STATE: After you plead guilty to murder of James Williamson in the Circuit Court of Tate County, you were interviewed by three officers of the Mississippi Highway Patrol. Those officers were Jay Clark, Jimmy Dees and Thomas McCloud.
 BY THE WITNESS: Right.
 BY THE STATE: And in that statement you admitted the part, or parts, you played in the killing and murdering of James Williamson.
 BY THE WITNESS: I plead the Fifth on that.
 ASSISTANT DISTRICT ATTORNEY (Mr. Kelly): Your Honor, I request the Court to direct the witness to answer that question.
 BY THE COURT: You must answer the question, Mr. Hentz. That was not the question as far as whether or not you plead guilty but whether or not you made any statements to those named individuals, Highway Patrol Investigators. Did you understand the question?
 BY THE WITNESS: Yes, sir. Yeah, I made a statement.
 (R. 54)
 BY THE STATE: . . . Isn't it a fact, Mr. Hentz, that you told those three officers that you met Cookie when your daddy sent you to her house to collect some gravel tickets because Cookie and her husband, James, owed you for the gravel. That this was probably around the first of October and then after several visits back and forth between you and Cookie and Mr. Williamson, you and Cookie got together at a motel in Grenada called the Hill Top. It was probably in December of 1981 and that was the first time that anything happened or was mentioned about killing James Williamson.
 (At this point in the proceedings, there was a conference between the witness and his attorney.)
 BY THE WITNESS: Based on the circumstances, I am going to plead the Fifth on all those questions.
 BY THE STATE: That's true, that's what you told them, isn't it?
 BY THE WITNESS: I said I plead the Fifth to all those questions.
 BY THE COURT: Again, Mr. Hentz, I must direct you to answer that question. Do you still plead the Fifth?
 BY THE WITNESS: Yes, sir.
 BY THE COURT: I am compelled then to find you in contempt of court.
 (R. 55, 56)
 BY THE STATE: Mr. Hentz, isn't it also true that you told those same three officers that Cookie had talked to someone before you about killing James Williamson?
 BY THE WITNESS: I plead the Fifth.
 BY THE STATE: Did you understand the question?
 BY THE WITNESS: Yeah, I understand everything.
 BY THE COURT: I have to direct then that you answer the question.
 BY THE WITNESS: I have got a motion to get the case brought back up and don't want to talk about it.
 BY THE STATE: Isn't it true you told those three officers that it would cost Cookie $10,000.00 for her to have James Williamson killed?
 BY THE WITNESS: I plead the Fifth.
 BY THE STATE: Do you understand the question?
 BY THE WITNESS: I plead the Fifth.
 BY THE COURT: I will have to find you in contempt then.
 (R. 56)
 BY THE STATE: Isn't it true that you told those three officers Cookie wouldn't have to get the hold [sic] $10,000.00 at one time. She could pay it a little at a time.
 BY THE WITNESS: I plead the Fifth.
 BY THE STATE: Did you understand the question?
 BY THE WITNESS: I plead the Fifth.
 (R. 57)
The State then asked the following series of questions, each of which Appellant acknowledged *Page 680 
that he understood and to each of which he "plead the Fifth" (R. 57-61):
 Isn't it true you told the officers that you asked Lee Harden to do the job for you?
 Isn't it true that you told Cookie that you could get someone from out-of-state to kill James Williamson?
 Isn't it true that you told the officers that sometime during January or February that you and Cookie had a little disagreement and you didn't discuss the murder for about a month?:
 Isn't it true that you told the officers that during the month of February that you and Cookie and Lee Harden went to Arkansas for Lee Harden to meet Cookie's cousin?
 Isn't it true that on Sunday, the 22nd day of March, that you told the officers that you and Cookie met in the motel room in Grenada?
 Isn't it true that you told the officers that Cookie said that everything is ready, the insurance was taken care of, everything was ready to go, and Cookie asked you to get in contact with the man that was to commit the murder?
 Isn't it true that you told the officers that at approximately 4:00 or 4:30 that morning Cookie was to go outside and feed the dogs so the killer could sneak into the house?
 And that the murderer was suppose to come in through the back door and go to the bathroom and he was suppose to hide and wait in the bathroom until Cookie left the house. Is that what you told the officers?
 Now, did you tell the officers that Lee Harden had a 12 guage [sic] shotgun and a gallon of gas and he was to pour the gasoline, shoot him, pour the gasoline in the room where he was and then go through the house lighting the curtains and then go on out the backdoor. Did you tell the officers that?
 Did you tell the officers that Cookie and Lee didn't get along?
 Did you tell the officers that Cookie treated Lee like a dog?
 Did you tell the officers that Lee was to get $10,000.00 out of it?
 Did you tell the officers that Lee Harden didn't collect his $10,000.00, that you would give Lee Harden $400.00 or $500.00 at a time or $200.00 or $300.00 at a time, that you couldn't recall how much money you had given Lee Harden?
 Did you tell the officers that it would be hard for you to estimate how much money you gave Lee Harden but that it wasn't near $10,000.00?
 Did you tell the officers that Roger Lynn was suppose to drive the car?
 Did you tell the officers that Roger Lynn wasn't suppose to get anything out of it?
 Did you tell the officers that you and Cookie had discussed killing Mrs. Mable Williamson, the 90 year old mother of James Williamson?
 Did you tell the officers the reason you and Cookie discussed killing Mrs. Mable Williamson was because the land surrounding the home upon which Cookie and James lived, Mrs. Mable had a life estate in it, Cookie couldn't get any income from it?
 Mr. Hentz, it is true that you and Cookie Williamson planned the murder of James Williamson, isn't it?
 It is true that you recruited Owen Lee Harden to be the man to pull the trigger and burn down the house of James Williamson, isn't it?
 Is it true that you recruited your younger brother, Roger Lynn Hentz, to drive one of the vehicles.
 (R. 57-61)
Upon being asked whether Roger Lynn was "solely responsible for the murder of James Williamson," appellant responded, "I don't really want to get into that." (R. 83). Appellant was then questioned and responded as follows:
 BY THE STATE: Well, do you deny you participated in the murder of James Williamson.
 BY THE WITNESS: Yeah. *Page 681 
 BY THE STATE: Do you deny that you told Thomas McCloud that you participated in the murder of James Williamson?
 BY THE WITNESS: I am going to have to start taking the Fifth on that.
 BY THE STATE: Do you deny that you told Thomas McCloud that you got $1100.00 from Cookie in order to pay off Owen Lee Harden so he could go to Carolina?
 BY THE WITNESS: I plead the Fifth on that.
 ASSISTANT DISTRICT ATTORNEY (Mr. Kelly): Your Honor, I request you direct the witness to answer the question.
 BY THE COURT: The last two questions, Mr. Hentz, you are hereby directed to answer. Is it still your statement that you will not answer?
 BY THE WITNESS: I plead the Fifth.
 BY THE COURT: You will be held in contempt of court.
 (R. 83-84)